Billie DAVENPORT, et al., Appellants,

v.

INTERNATIONAL BROTHERHOOD
OF TEAMSTERS, AFL–CIO, et
al., Appellees.

No. 97–7190.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 13, 1998.

Decided Feb. 2, 1999.

Barbara Harvey argued the cause for appellants. With her on the briefs was Arthur L. Fox, II.

Daniel B. Edelman argued the cause for appellee International Brotherhood of Teamsters, AFL–CIO. With him on the brief was Earl V. Brown, Jr.

Neal D. Mollen argued the cause for appellee Northwest Airlines, Inc. With him on the brief was John J. Gallagher.

Edgar N. James and Marta Wagner were on the brief for appellee Teamsters Local 2000.

Before: HENDERSON, ROGERS and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

The plaintiffs in this case are individual members of the International Brotherhood of Teamsters, AFL–CIO ("IBT"), and of IBT Local 2000 ("Local 2000") which represents all flight attendants employed by Northwest Airlines ("Northwest"). The dispute concerns a temporary labor agreement known as the "Bridge Agreement." Plaintiffs sued the IBT, Local 2000 and Northwest, contending that the president of Local 2000 lacked authority to enter into the Bridge Agreement because he failed to submit it for ratification by the union's membership. The district court denied plaintiffs' request for a preliminary injunction against implementation of the Agreement. We affirm.

## I

The employment relationship between Northwest and its flight attendants is governed by a collective bargaining agreement entered into on August 1, 1993.[1] Section 5.A of the agreement regulates the number of hours a flight attendant can be required to

fly within a given period of time ("flight time"), the number of hours a flight attendant can be required to work in a shift ("duty time"), and rest periods. *See* Appendix ("App.") 78–80. Specifically, § 5.A.3.b prescribes what is known as the "8–in–24" rule, which states that a flight attendant cannot be scheduled for more than 8 hours of flight time within any 24–hour period unless certain interim rest conditions are met. Section 5.A.3.d states that attendants generally cannot be scheduled for more than 30 hours of flight time in any 7–day period. Section 5.A.4 provides the additional restriction that duty time may last no more than 12 to 14 hours.

In March 1993, while the collective bargaining agreement was under negotiation, the Federal Aviation Administration announced that for the first time it was considering including flight attendant duty time in its Federal Aviation Regulations ("FARs"). *See* 58 Fed.Reg. 17,024 (1993). Northwest and the IBT responded by including the following language in the final version of section 5.A.3:

> Current Federal Air Regulations as described in paragraphs 3.a. through e. below, shall apply to all Flight Attendants for daily and weekly limitations. Any changes or modifications in the Federal Air Regulations shall also be applied to Flight Attendants.

App. 78. The new FARs were published on August 19, 1994 and became effective in early 1996. They regulate duty time and rest periods for flight attendants by permitting airlines to assign duty time of 14 to 20 hours, rather than the 12 to 14 hours prescribed by the collective bargaining agreement. The FARs do not limit flight time, whereas the collective bargaining agreement limits it to 8 hours in 24 and 30 hours in 7 days. *See* 59 Fed.Reg. 42,974 (1994); 14 C.F.R. § 121.467.

Northwest took the position that in light of the new FARs, section 5.A.3 of the collective bargaining agreement permitted it to implement changes in the flight time limits, as well

---

1. By its terms, the 1993 agreement became amendable 60 days prior to August 2, 1996, and the parties currently are engaged in negotiations for a new collective bargaining agreement. Complaint ¶ 18.

as to override other limits previously set forth in section 5.A. At a meeting on October 31, 1994, the then-president of Local 2000, Mary Don Erskine, disagreed. Erskine's successor as president of Local 2000, Bruce Retrum, took office two months later, on January 1, 1995. Northwest continued to press its position and negotiations ensued.

In June 1996, Northwest sent Retrum a proposed letter of agreement and stated that if the dispute were not resolved shortly, Northwest would seek arbitration. App. 194. Northwest's proposal was known as the "Bridge Agreement," so-called because it was intended to remain effective only for a "bridge" period until a permanent agreement was reached under a new collective bargaining agreement. *See supra* note 1. Under the Bridge Agreement, Northwest would be allowed to override the 8-in-24 rule when scheduling "higher value turnarounds" ("HVTs"), flight sequences that begin and end at a flight attendant's home base and generally do not involve more than three separate flight segments. In return, Northwest would pay flight attendants higher, international flight rates in certain instances involving longer flight and duty time, and would refrain from implementing other modifications in flight and duty time it believed authorized by the new FARs.

On July 17, 1996, Retrum responded that he would prefer to continue negotiations rather than begin arbitration. Northwest agreed to postpone arbitration, and negotiations continued for the next several months without resolution. An arbitration date was set for January 29, 1997.

In late January 1997, just before the arbitration was scheduled to begin, Retrum held two conference calls to discuss the situation with base representatives and executive board members of Local 2000. Retrum said that he had reviewed the Bridge Agreement with the lawyers for Local 2000, who had advised him that the Local "could not hope to win an arbitration" on the matter. *Id.* at 39. Retrum took a vote of the base representatives and executive board to determine whether to arbitrate the issue, accept the Bridge Agreement, or do nothing. The majority voted to accept the proposal. *Id.* at 40.

Some Local 2000 representatives, however, objected to adopting the Agreement without ratification by the membership. During one of the conference calls, Retrum explained that since the Agreement "was a grievance settlement and not an amendment to the contract," ratification was unnecessary. *Id.* at 476. Thereafter, Retrum consulted with the IBT Legal Department regarding membership ratification, and was specifically advised that ratification was unnecessary. *Id.* at 477. Retrum signed the Bridge Agreement on February 11, 1997.

On March 11, 1997, five union members, two of whom are plaintiffs in this case, wrote to the then-General President of the IBT, Ron Carey, expressing their view that Retrum had no authority to enter into the Bridge Agreement without membership ratification. They asked Carey to review the matter and determine whether ratification was required. *Id.* at 363-64. On March 21, 1997, Carey wrote to Retrum. Carey stated that he had "completed [his] review of the flight duty time issue and the terms of the settlement signed by Local 2000." He recommended that the Local "immediately communicate the terms of the settlement to the membership," "encourage membership input regarding aspects of the settlement which they believe adversely impacts them," and then "use this member information to determine its bargaining proposal or position" in ongoing negotiations with Northwest for a new collective bargaining agreement. He did not, however, suggest that ratification was required. *Id.* at 62-63.

On August 8, 1997, the IBT wrote to Northwest. "Without taking a position as to whether the bridge agreement is subject to [the ratification] requirement," the IBT wrote, "there is a colorable issue as to the agreement's validity absent ratification." *Id.* at 10. The IBT advised Northwest that it would submit the matter to the membership for an advisory vote, and specifically reserved the right to arbitrate the issue. *Id.* at 10-11. Northwest responded on August 12, 1997 that, pursuant to the Bridge Agreement, it would implement HVTs in September and October 1997. *Id.* at 189.

On August 26, 1997, the plaintiffs sued to prevent implementation of the Agreement and moved for a temporary restraining order and preliminary injunction. The complaint, which named the IBT, Local 2000, and Northwest as defendants, alleged three causes of action. Plaintiffs contended that by going ahead with the Bridge Agreement without membership ratification, Local 2000 and the IBT had: (1) violated plaintiffs' equal voting rights under section 101(a)(1) of the Labor–Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(1);[2] (2) breached plaintiffs' ratification rights under the IBT constitution in violation of section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185;[3] and (3) breached their duty of fair representation. App. 1–9. The complaint did not assert a cause of action against Northwest, although it did allege that Northwest "knew and understood that a supplemental agreement or agreement to modify or amend a collective bargaining agreement was required to be ratified by the affected membership before it may be implemented," and that Northwest could not "lawfully implement the Bridge Agreement with knowledge that it was not ratified in accordance with the IBT constitution." *Id.* at 5, 7.

On October 3, 1997, the district court denied the motion for a preliminary injunction, holding that plaintiffs could not establish a likelihood of success on the merits. Treating the counts leveled against the union defendants as if they also had been leveled against Northwest, the court held that the two statutory causes of action could not lie against Northwest. See *Davenport v. International Bhd. of Teamsters,* 981 F.Supp. 6, 8–9 (D.D.C.1997). LMRDA § 101, the court held, governs only the rights of union members against unions. LMRA § 301, it said, does not apply to employers like Northwest,

who are subject to the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–188. The district court further held that because Northwest had not bargained in bad faith, and had not knowingly implemented an unratified agreement that was an obvious alteration of the terms of the collective bargaining agreement, the duty of fair representation could not give rise to a valid cause of action against Northwest. *Davenport,* 981 F.Supp. at 8–9 & n. 2.

Subsequently, the members of Local 2000 elected plaintiffs Billie Davenport and Danny Campbell as the two principal officers of Local 2000, with Davenport replacing Retrum as president. On December 18, 1997, the IBT held a referendum on the Bridge Agreement and the members rejected it decisively. Thereafter, the IBT demanded that Northwest rescind the Agreement. When Northwest refused, the IBT filed a crossclaim against Northwest pursuant to the RLA, seeking an injunction requiring Northwest to cease applying the Bridge Agreement and to restore and maintain the status quo.

## II

Plaintiffs appeal the district court's denial of their motion for a preliminary injunction. Although the IBT and Local 2000 remain nominal defendants-appellees, they now support the position of the plaintiffs.

■ A court considering a plaintiff's request for a preliminary injunction must examine whether: (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by an injunction. See *Serono Lab. v. Shalala,* 158 F.3d 1313, 1317–18 (D.C.Cir.1998). These

---

**2.** LMRDA § 101(a)(1) provides:

> Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

**3.** LMRA § 301(a) provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

factors interrelate on a sliding scale and must be balanced against each other. *Id.* at 1318. We review the district court's weighing of the preliminary injunction factors for abuse of discretion, while reviewing its underlying legal conclusions de novo and its underlying factual findings for clear error. *Id.*

## III

The district court held that the plaintiffs were not likely to succeed on the merits because they could not establish a cause of action against Northwest. Plaintiffs do not appeal the court's rejection of their claim under LMRDA § 101, *see* Pl. Br. at 14 n.6, but do dispute the court's conclusions with respect to the duty of fair representation and LMRA § 301. They also raise a number of additional, miscellaneous arguments.

## A

The Railway Labor Act, 45 U.S.C. §§ 151–188, governs labor relations in the railroad and airline industries. Section 2 of the RLA grants to employees the right to organize and bargain collectively through representatives of their own choosing, and requires employers under the Act to bargain exclusively with the representatives so chosen. 45 U.S.C. § 152. Based on that section and other considerations, the Supreme Court has inferred a duty of fair representation owed by unions to their members. *See Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 74–76, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991); *Steele v. Louisville & Nashville R.R. Co.,* 323 U.S. 192, 199–203, 65 S.Ct. 226, 89 L.Ed. 173 (1944).[4]

■■■ A union "breaches its duty of fair representation if its actions are either 'arbitrary, discriminatory, or in bad faith.'" *Air Line Pilots,* 499 U.S. at 67, 111 S.Ct. 1127

(quoting *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)). A union's actions are arbitrary, the Supreme Court has held, "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Id.* at 67, 111 S.Ct. 1127 (internal quotation and citation omitted); *see Marquez v. Screen Actors Guild,* —— U.S. ——, ——, 119 S.Ct. 292, 300, —— L.Ed.2d —— (1998). "The duty of fair representation does not itself require ratification votes," although "the discriminatory denial of the right to ratify [an agreement with the employer] may be inconsistent with a union's obligation." *American Postal Workers Union, Local 6885 v. American Postal Workers Union ("Postal Workers"),* 665 F.2d 1096, 1105 n. 20 (D.C.Cir. 1981).

■■■ Under certain circumstances, where a union has breached its duty of fair representation an employer may also be implicated in the union's breach. *See Czosek v. O'Mara,* 397 U.S. 25, 29, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970); *Postal Workers,* 665 F.2d at 1109–10; *Steffens v. Brotherhood of Ry., Airline & S.S. Clerks,* 797 F.2d 442, 445 & n. 2 (7th Cir. 1986). In *Postal Workers,* we recognized that "an employer may sometimes be joined in a suit involving duty of fair representation claims against a union." 665 F.2d at 1109. We noted that "[i]n all such cases, however, the employer somehow acted improperly and infringed the rights of the individual aggrieved employees." *Id.* We further observed that in such cases, "the court[s] required that the employer have actual notice of, or might reasonably be charged with notice of, the union's breach of duty to its members." *Id.*

The parties dispute the proper standard for determining whether an employer can be implicated in a union's breach of duty. *See, e.g., Marquez v. Screen Actors Guild,* —— U.S. ——, ——, 119 S.Ct. 292, 300, —— L.Ed.2d —— (1998) (citing *Air Line Pilots,* 499 U.S. at 67, 111 S.Ct. 1127); *Air Line Pilots,* 499 U.S. at 67, 111 S.Ct. 1127 (citing *Vaca,* 386 U.S. at 190, 87 S.Ct. 903); *Ford Motor Co.,* 345 U.S. at 337, 73 S.Ct. 681 (citing *Steele,* 323 U.S. at 198–99, 65 S.Ct. 226).

4. The duty of fair representation also applies to unions certified under the National Labor Relations Act ("NLRA"), based on NLRA provisions comparable to section 2 of the RLA. *See Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Ford Motor Co. v. Huffman,* 345 U.S. 330, 336–37, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). Cases describing the scope of the duty freely cite precedents under both statutes.

Northwest focuses on the language in *Postal Workers* which requires that "the employer somehow acted improperly." *Id.* Citing cases from several circuits, Northwest contends that a plaintiff must "prove employer misconduct which amounts to collusion in the union's breach," Northwest Br. at 20, and not simply "knowledge" of the breach. *See, e.g., Dement v. Richmond, Fredericksburg & Potomac R.R.,* 845 F.2d 451, 464 n. 21 (4th Cir.1988); *United Indep. Flight Officers v. United Air Lines,* 756 F.2d 1274, 1283 (7th Cir.1985); *Raus v. Brotherhood Ry. Carmen,* 663 F.2d 791, 797–98 (8th Cir.1981).

Plaintiffs, by contrast, fasten on the "actual notice" language of *Postal Workers,* and argue that an employer's "knowledge" of a union's breach is a sufficient predicate. They contend that the union breached its duty of fair representation when it signed the Bridge Agreement without ratification by the membership, knowing. that ratification was required. And they further assert that Northwest implicated itself in the union's breach by signing the Agreement with knowledge both that ratification was required and that the union had knowingly dispensed with it. In support, they cite, inter alia, *Goclowski v. Penn Central Transportation Co.,* in which the Third Circuit indicated that a cause of action could be made out against both a union and an employer if plaintiffs "establish that the Union had no authority to enter into [an] agreement and that the employer was aware of this contractual disability." 571 F.2d 747, 760 (3d Cir.1978). *But see id.* at 761 n. 18 ("On the facts of the instant case, the Railroad's *collusion* with the Union, if proved, would amount to an undermining of the basic collective bargaining agreements.") (emphasis added). *See also Merk v. Jewel Food Stores,* 945 F.2d 889, 896 (7th Cir.1991) (stating that "[f]ailure to ratify under circumstances where an employer is aware both of the ratification requirement and of the failure to comply with it may invalidate an employer's claims under the unratified agreement," but noting that "crucial to our analysis" is that "non-ratification

was coupled here with a deliberate policy of secrecy").

■ We need not resolve this legal dispute in order to decide this case, because the plaintiffs cannot show a likelihood of success on the merits even under the standard they propose.[5] Plaintiffs do not contend that an employer's (or union's) mere mistake about whether ratification was required is enough to create liability. *See Postal Workers,* 665 F.2d at 1101 (noting that interpretations of union constitutions by unions, "if reasonable and in good faith, are not to be disturbed by the courts"). They concede that the requirement of ratification must at least be "objectively clear" at the time. *See* Oral Arg. Tr. at 60–62. Indeed, plaintiffs do not disagree with the district court's characterization of their own leading case, *Goclowski,* as one in which " 'the employer . . . knowingly implemented an unratified agreement that was an obvious alteration of the terms of the collective bargaining agreement.' " Pl. Br. at 37 (quoting *Davenport,* 981 F.Supp. at 9 n. 2 ). They simply disagree with the court's determination that this case does not share those facts. But we review such a factual finding only to determine whether it is clearly erroneous, and we cannot so characterize the district court's finding here.

Plaintiffs accurately note that the IBT constitution provides that "amendments" to collective bargaining agreements must be ratified by the membership. Article XII, section 2(b). And plaintiffs' contention that the Bridge Agreement constituted such an amendment is not an unreasonable one. But the contrary view, that the Bridge Agreement did not alter the terms of the collective bargaining agreement but merely settled a dispute over their interpretation, is also not unreasonable, let alone irrational. *See Air Line Pilots,* 499 U.S. at 67, 111 S.Ct. 1127 (holding that a union breaches its duty of fair representation only where its behavior is "so far outside a wide range of reasonableness as to be irrational") (internal quotation and citation omitted).

---

5. For the same reason, we need not decide whether the union itself breached its duty, a necessary prerequisite for concluding that the

employer was implicated in such a breach. *See Postal Workers,* 665 F.2d at 1108.

The collective bargaining agreement provided that "[a]ny changes or modifications in the Federal Air Regulations shall also be applied to Flight Attendants." Section 5.A.3. Based on this provision, Northwest contended that the new FARs superseded the duty time and rest period limitations found elsewhere in the collective bargaining agreement. Retrum, the Local's president, was advised by the Local's legal counsel that the union "could not hope to win an arbitration" if it disputed Northwest on this issue. App. 39. He was also advised by IBT counsel that:

> Letters of understanding that either interpret and/or assist in the application of existing contract language or provide language which memorializes the parties' understanding of a subject by filling in gaps in the contract generally do not require ratification. These types of letters do not change the terms of the contract but merely interpret and apply the contract that was ratified by the membership.

*Id.* at 26. And the week before Retrum signed the Bridge Agreement, he was "specifically advised" by IBT counsel that ratification of the Agreement was unnecessary. *Id.* at 479. Based on this advice, Retrum concluded that the union constitution "did not have to be ratified because [it] did not create new contract terms but only resolved a dispute over interpretation of the existing contract." *Id.* at 312; *see id.* at 477–78.[6]

While the IBT now contends that ratification was required, that is a position it arrived at quite late.[7] Even after the signing of the Agreement, the IBT's Legal Department twice reaffirmed that "no ratification vote was necessary in the opinion of the IBT because the Bridge Agreement was a grievance settlement and not an amendment to the collective bargaining agreement." *Id.* at 479; *see id.* at 481. When the plaintiffs put the question directly to the IBT's then-General President, Ron Carey, he did not suggest that ratification was required. Instead, he merely noted in a letter that

> [w]hen the [new] FARs became effective Northwest advised Local 2000 that it believed the terms of the collective bargaining agreement permitted it to implement changes to the daily and weekly limitations.... The Company argued that it could apply the new FARs to Teamster members and ignore the better contract language because of language ... which provides that "any changes or modifications in the Federal Air Regulations shall also be applied to flight attendants."

*Id.* at 62. Even after individual union members threatened to sue over the failure to ratify, the IBT's Associate General Counsel told Northwest only that "there is a colorable issue as to the agreement's validity absent ratification"—while expressly declining to "conced[e] the correctness of the complaining members' legal position." *Id.* at 10. Indeed, in their amended complaint, plaintiffs charged that "[t]he IBT has not repudiated the Bridge Agreement and by its actions it has ratified the Agreement." *Id.* at 464–65, ¶ 14.[8]

Of course, none of this establishes as a matter of law that Northwest's bargaining position was correct or that ratification was unnecessary to settle the dispute. But it

---

6. Although the Bridge Agreement used the words "amend" and "modify" in its text, Retrum explained that the Agreement used "this terminology not because it is an amendment or supplemental agreement, but because the underlying language" of the existing collective bargaining agreement itself used it. App. 477. As Retrum pointed out, § 5.A.3.b provided that "[a]ny changes or modifications" in the FARs "shall also be applied to Flight Attendants." *See id.*; *see also id.* at 78. Retrum also pointed out that side-letters typically used by the union and Northwest to resolve disputes over interpretation of the collective bargaining agreement (discussed in the text below) were sometimes labeled "contract amendments." *Id.* at 306–07.

7. The IBT took this position in its answer to the plaintiffs' amended complaint, filed on September 24, 1997. App. 513, ¶ 14.

8. Even on appeal, the IBT concedes that "[t]he IBT constitution does not require that settlements of grievances arising under a CBA [collective bargaining agreement] be submitted for membership ratification." IBT Br. at 7 (emphasis omitted). It also concedes that the Bridge Agreement "grew out of ... a dispute between [Northwest] and Local 2000 over the proper interpretation of the underlying" collective bargaining agreement. *Id.* It contends, however, that the Agreement "did not resolve" that dispute and instead "effected a series of amendments to the underlying CBA." *Id.*

does support the district court's conclusion that, unlike *Goclowski*, this was not a case where "the employer ... knowingly implemented an unratified agreement that was an obvious alteration of the terms of the collective bargaining agreement." *Davenport*, 981 F.Supp. at 9 n. 2; *cf. Goclowski*, 571 F.2d at 760 ("Plaintiffs have set forth far more than a mere disagreement with Union officials over the meaning of the Union's constitution."). The fact that the IBT itself described plaintiffs' position as no more than "colorable" seriously undermines its current contention that the employer should have assessed that position as "obviously" correct. Indeed, given the conclusion of the Local's president that ratification was unnecessary, it would have been problematic for Northwest to have refused to implement the agreement without ratification. *See Moreau v. James River–Otis, Inc.*, 767 F.2d 6, 10 (1st Cir.1985) ("Management should neither be allowed nor required to scrutinize internal union policies and practices too closely, and, indeed, it may commit an unfair labor practice if it delves too deeply into the union's affairs."); *Central States Southeast & Southwest Areas Pension Fund v. Kraftco, Inc.*, 799 F.2d 1098, 1113 & n. 19 (6th Cir.1986); *cf. Teamsters Local Union No. 251 and Mclaughlin & Moran, Inc.*, 299 N.L.R.B. 30, 32, 1990 WL 122528 (1990) ("[A]n employer may not lawfully refuse to sign a contract on the basis that the union's ratification procedures were not in accordance with the requirements of its constitution and bylaws.").

The conclusion that a ratification requirement was not "obvious" is further supported by a history in which Northwest and Local 2000 had settled numerous contract interpretation disputes via side-letter agreements signed by the Local 2000 president without ratification by the membership. As Retrum explained, these letters "typically resolve[d] some dispute between Local 2000 or its predecessors and Northwest Airlines concerning the proper interpretation or application of the Collective Bargaining Agreement," and had never been challenged as not binding because they had not been ratified. App. 306–07. While these letter agreements were not as far-reaching as the Bridge Agreement, many did interpret substantive collective bar-

gaining agreement provisions. This established practice of settling disputes without ratification undermines plaintiffs' contention that Northwest should have known Retrum lacked authority to enter into a binding agreement without ratification. *See Central States*, 799 F.2d at 1114 ("[T]he union's entry into and compliance with [two] prior letter agreements constituted representations by the union to the employer that union officials were authorized to enter into side letter agreements ... without ratification."); *cf. NLRB v. International Union of Elevator Constructors, Local No. 8*, 465 F.2d 974, 975 n. 1 (9th Cir.1972) ("When a union representative indicates that he has authority to enter into a binding agreement without membership ratification, and there is an established history of entering into bargaining agreements without such ratification, the [u]nion cannot later contend that ratification is necessary.").

Finally, plaintiffs argue that Northwest knew or should have known that ratification of the Bridge Agreement was required because the union had insisted on a ratification vote when Northwest made an earlier attempt to implement higher value turnarounds in 1992. The circumstances in 1992, however, were considerably different. Like the 1993 collective bargaining agreement, the agreement in effect in 1992 set flight and duty time restrictions. But unlike the 1993 agreement, the earlier collective bargaining agreement did not provide that "[a]ny changes or modifications in the FARs shall be applied to Flight Attendants." Accordingly, in 1992 it was clear that Northwest could implement HVTs only by amending the collective bargaining agreement. Under the 1993 agreement, by contrast, Northwest could reasonably argue that under the new FARs it had authority to implement HVTs without amending the agreement.

In sum, even assuming that an employer can be implicated in a union's breach of the duty of fair representation merely by implementing an agreement with knowledge of that breach, we cannot find clearly erroneous the district court's conclusion that Northwest had no such knowledge. Accordingly, we agree with the district court that plaintiffs

are not likely to succeed on the merits of this claim against the airline.

**B**

■ Plaintiffs also appeal the district court's rejection of their claim under LMRA § 301, 29 U.S.C. § 185(a). *See supra* note 3. That section provides both jurisdiction and a cause of action for suits alleging a violation of a contract between an employer and a labor organization, or between labor organizations. *See Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 456, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *see also Local 144 Nursing Home Pension Fund v. Demisay,* 508 U.S. 581, 590, 113 S.Ct. 2252, 124 L.Ed.2d 522 (1993); *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 23, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). Plaintiffs contend that § 301 subjects Northwest to "accountability for knowingly benefitting from [the] union's violation of members' ratification rights." Pl. Br. at 41.

As the district court pointed out, however, LMRA § 301 does not apply to this case. The LMRA applies only to "contracts between an employer and a labor organization representing employees in an industry affecting commerce *as defined in this chapter,* or between any such labor organizations." 29 U.S.C. § 185 (emphasis added). "Employer" is defined in the chapter to exclude "any person subject to the Railway Labor Act," *id.* § 152(2), and "employee" is defined to exclude "any individual employed by an employer subject to the Railway Labor Act," *id.* § 152(3).[9] As a "common carrier by air," Northwest is subject to the RLA. 45 U.S.C.

§ 181. Accordingly, as the district court held, a cause of action does not lie against Northwest under section 301. *See Brotherhood of Teamsters Local No. 70 v. Western Pac. R.R.,* 809 F.2d 607, 609 (9th Cir.1987); *Steffens,* 797 F.2d at 445 n. 2; *United Indep. Flight Officers, Inc.,* 756 F.2d at 1283; *Fechtelkotter v. Air Line Pilots Ass'n, Int'l,* 693 F.2d 899, 902–03 (9th Cir.1982); *Raus,* 663 F.2d at 794; *Brotherhood of Locomotive Firemen v. United Transp. Union,* 471 F.2d 8, 9 (6th Cir.1972).[10]

**C**

Neither plaintiffs' original complaint, nor their amended complaint, expressly stated any cause of action against Northwest. Nonetheless, the district court liberally construed the complaint to assert the same causes of action against Northwest as it asserted against the Local and the IBT. We have accepted that characterization for purposes of this appeal, and have reached the same conclusions as the district court regarding the validity of those claims.

Plaintiffs' appellate briefs offer three additional lines of argument. But not only do those arguments fail to state a cause of action against Northwest, they fail to articulate a cause of action against any party.

■ First, plaintiffs point to 28 U.S.C. § 1337 as a statute that subjects Northwest to accountability for benefitting from the union's asserted violation of its members' ratification rights. Pl. Br. at 41. Section 1337, however, merely grants district courts *"jurisdiction* of any civil action or proceeding aris-

---

**9.** 29 U.S.C. § 152 itself provides definitions only for use in subchapter II of Chapter 7, Title 29 of the United States Code. LMRA § 301, 29 U.S.C. § 185, is in subchapter IV. 29 U.S.C. § 142(3), however, provides that "employer," "employee" and "labor organization" "shall have the same meaning" when used throughout Chapter 7 "as when used in subchapter II."

**10.** Nor are we persuaded by plaintiffs' contention that *Wooddell v. International Brotherhood of Electrical Workers, Local 71,* 502 U.S. 93, 112 S.Ct. 494, 116 L.Ed.2d 419 (1991), overrules this line of authority. *Wooddell* did not address the application of section 301 to actions involving employers and employees subject to the RLA. Rather, *Wooddell* merely held, in a case in which

all of the parties were subject to the LMRA, that a union constitution is a "contract between labor organizations" and hence covered by section 301. *See id.* at 98–100, 112 S.Ct. 494. Here, although plaintiffs' claim does involve such a contract, one of the parties—Local 2000—is not a "labor organization" within the meaning of section 301 because its members are employed by an employer subject to the RLA. *See* 29 U.S.C. §§ 152(2), (3), (5); *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 376–77, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969); *Fechtelkotter,* 693 F.2d at 902–03; *Brotherhood of Locomotive Firemen,* 471 F.2d at 9; *Bell v. Chesapeake & Ohio Ry.,* 58 F.R.D. 566, 568–69 (S.D.W.Va.1973).

ing under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." 28 U.S.C. § 1337(a) (emphasis added). Plaintiffs have identified no Act of Congress—other than those discussed above—under which such a cause of action might arise.

■ Second, plaintiffs contend that Northwest may be joined in their action against the Local and the IBT under Rule 19 of the Federal Rules of Civil Procedure, which provides for the "joinder of persons needed for just adjudication." Northwest is a necessary party, plaintiffs contend, because its presence is necessary for the court to set aside the Bridge Agreement. But while Rule 19 provides for joinder of necessary parties, it does not create a cause of action against them. *See Vieux Carre Property Owners, Residents & Assocs., Inc. v. Brown,* 875 F.2d 453, 457 (5th Cir.1989) ("[I]t is implicit in Rule 19(a) itself that before a party will be joined . . . as a defendant the plaintiff must have a cause of action against it."); *cf.* 4 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 19.04[1][a] (3d ed.1998) ("[Rule 19] governs only the *procedural propriety* of joinder and, as a rule of procedure, cannot affect the jurisdiction or venue of the federal court."). It is not enough that plaintiffs "need" an injunction against Northwest in order to obtain full relief. They must also have a right to such an injunction, and Rule 19 cannot provide such a right. *See* 28 U.S.C. § 2072(b) ("[The Federal Rules of Civil Procedure] shall not abridge, enlarge or modify any substantive right."); *Postal Workers,* 665 F.2d at 1110 (holding that plaintiffs may not use Rule 19 to join employer in action against union unless plaintiffs show employer "to have been implicated in the union's breach of duty to its members").[11]

Finally, the plaintiffs' briefs discuss at length the contention that President Retrum lacked both actual and apparent authority to sign the Bridge Agreement without member-

ship ratification. That discussion, however, floats free of a tether to any specified cause of action against Northwest. It may be that plaintiffs intend that discussion to bolster their breach of duty argument. As noted above, however, even on plaintiffs' own theory they must establish not merely that Retrum lacked authority (actual or apparent) to sign the Agreement, but that it was "objectively clear" or "obvious" to Northwest that he did. It may also be that plaintiffs intend their actual/apparent authority discussion to support their LMRA § 301 claim. But even if Retrum lacked authority to sign the Bridge Agreement, that would not alter the fact that section 301 is inapplicable to employers and labor organizations subject to the RLA.

The plaintiffs may also intend their argument that Retrum lacked actual or apparent authority to itself constitute some kind of cause of action against Northwest. If that is what they intend, however, they have failed to allege anything remotely resembling such a claim in either their initial or amended complaints. *See* App. 1–9, 461–69. It is far too late in the day to do so now. *See Hoai v. Vo,* 935 F.2d 308, 315 (D.C.Cir.1991). Accordingly we find nothing in plaintiffs' discussion of Retrum's authority to upset the district court's conclusion that plaintiffs are unlikely to prevail on the merits against Northwest.

## IV

In light of our affirmance of the district court's conclusion that the plaintiffs are not likely to succeed on the merits, it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiffs' favor. *See Murrow Furniture Galleries v. Thomasville Furniture Indus.,* 889 F.2d 524, 527 (4th Cir.1989). Plaintiffs have not made such a showing.

---

11. Plaintiffs rely primarily on *Evans v. Sheraton Park Hotel,* 503 F.2d 177 (D.C.Cir.1974), which they contend permitted a plaintiff to join an international union in her civil rights action against sex-segregated locals, even though the international had "no part in the wrongdoing." Pl. Br. at 31. Far from having "no part in the

wrongdoing," however, we held that the international had "maintained" the sex-segregated locals. *Id.* at 184. Moreover, the plaintiff in *Evans,* unlike the plaintiffs in the present case, had a cause of action (under 42 U.S.C. § 2000e–2(c)) against the party she sought to join under Rule 19. *See id.* at 184–86.

■ Although they do not press a public interest argument on appeal,[12] plaintiffs do contend that they will suffer irreparable injury in the absence of an injunction. Their principal contention is that the HVTs increase the flight time required of flight attendants in a given duty period, while at the same time eliminating attendants' per diem pay and hotel allowances because overnight stays are no longer required on such trips. Northwest replies that the attendants serving on such flights are those who affirmatively seek them because the turnarounds permit completion of a month's work in fewer work days. This dispute is not important, however, because the injury plaintiffs urge is in any event not irreparable. If plaintiffs ultimately succeed on the merits, this kind of injury can be remedied with money damages. *See Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.").

■ Plaintiffs also contend that implementation of the Bridge Agreement has caused the union irreparable injury by depriving it of a valuable bargaining chip in its current negotiations for a new collective bargaining agreement. *See supra* note 1. Any such injury, however, is mitigated by the Bridge Agreement's express provision that the Agreement remains in effect only "for the duration of the current negotiations," and "that the terms of this Agreement shall operate without prejudice to either parties' [sic] position in any subsequent negotiation or arbitration." App. 67. Indeed, in reviewing the issue, the IBT General President found this to be the "most significant element of the settlement." *Id.* at 63. Moreover, if there were any such injury, it would have reciprocal application to Northwest: whatever bargaining advantage the union would lose to Northwest in the absence of an injunction, Northwest would lose to the union in the presence of one. *See Serono Lab.*, 158 F.3d at 1326.[13]

In sum, because plaintiffs have demonstrated neither likelihood of success on the merits nor irreparable injury, the district court did not abuse its discretion in denying the motion for a preliminary injunction.

## V

■ Finally, the IBT suggests as an alternative disposition that we vacate the district court's order and remand the case for consideration of its cross-claim for an injunction restoring the status quo prior to the Bridge Agreement.

■ Under the Railway Labor Act, an adjustment board established by the employer and the unions representing its employees has exclusive jurisdiction over "minor disputes," defined as those arising "out of grievances or out of the interpretation or application" of existing collective bargaining agreements.[14] *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 303, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989) (quoting 45 U.S.C. § 153 First (i)); *see also id.* at 304 n. 4, 109 S.Ct. 2477 (noting airline industry provision of 45 U.S.C. § 184); *International Ass'n of Machinists v. Central Airlines*, 372 U.S. 682, 687–89, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963). In the case of so-called "major disputes," however, the district courts have jurisdiction to enjoin violations of the status quo pending the completion of required bargaining and mediation procedures. *Consolidated Rail Corp.*, 491 U.S. at 302–03, 109 S.Ct. 2477; *see* 45 U.S.C. §§ 152 Seventh, 155, 156. "Major disputes" are defined as those relating to "the forma-

---

12. Plaintiffs initially contended before the district court that there were "health and safety reasons" for granting a temporary restraining order. They ultimately conceded, however, that this contention was "not supported on this record." App. 452–53.

13. Plaintiffs also contend that the deprivation of their right of ratification itself constitutes irreparable injury, even apart from the collateral consequences discussed above. But this conten-

tion is inextricably linked to the merits: plaintiffs suffer such an injury only if they in fact have such a right, a proposition they have not established.

14. Suits for breach of the duty of fair representation are an exception. *See Glover v. St. Louis–San Francisco Ry.*, 393 U.S. 324, 328–29, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969); *Raus*, 663 F.2d at 794.

tion of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy." *Consolidated Rail Corp.*, 491 U.S. at 302, 109 S.Ct. 2477 (quoting *Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945)).

The IBT contends that the present case concerns a "major dispute," and that it is entitled to an injunction requiring Northwest to cease applying the Bridge Agreement pending completion of the required procedures. To establish that contention, the IBT must show that the dispute is not "arguably justified by the terms of the parties' collective-bargaining agreement." *Id.* at 307, 109 S.Ct. 2477; *see Air Line Pilots Ass'n v. Eastern Air Lines*, 869 F.2d 1518 (D.C.Cir.1989). Whatever the merits of the IBT's position, it does not provide grounds for vacating the district court order currently before this court. The claim advanced by the IBT is different from those raised by plaintiffs. Because it was not filed until after the district court issued its order and after the plaintiffs filed their notice of appeal, the court did not—and did not have an opportunity to—rule on the merits of the IBT's claim. On remand, the parties will have a chance to present their arguments concerning this issue, and the court will have an opportunity to render a decision.

## VI

The denial of plaintiffs' motion for a preliminary injunction is affirmed and the case is remanded to the district court.