### NATIONAL HEAD START ASSOCIATION, Plaintiff,

v.

### DEPARTMENT OF HEALTH AND HUMAN SERVICES, and Tommy G. Thompson, Secretary, Department of Health and Human Services, Defendants.

### No. CIV.A. 04–0067(JDB).

United States District Court, District of Columbia.

Jan. 20, 2004.

Edward T. Waters, Feldesman Tucker Leifer Fidell, Washington, DC, for National Head Start Ass'n.

William Mark Nebeker, U.S. Attorney's Office, Washington, DC, for Dept. of Health and Human Services.

### MEMORANDUM OPINION

BATES, District Judge.

The National Head Start Association ("NHSA") seeks a temporary restraining order to prevent the Department of Health and Human Services and Secretary Tommy Thompson (collectively "HHS") from requiring NHSA member organizations to complete a survey regarding the compensation of their senior managers. NHSA members—Head Start programs around the nation—receive grants from HHS pursuant to the Head Start Act, 42 U.S.C. § 9831 *et seq.*, and are subject to a bevy of HHS financial record-keeping and reporting requirements. *See, e.g.,* 42 U.S.C. § 9842; 45 C.F.R. §§ 74.21, 74.27, 74.52, 74.53. The survey at issue is not expressly contemplated by any statute or regulatory provision. Rather, it was generated by HHS in response to a request from the Representative John Boehner, Chairman of the House Committee on Education and the Workforce, and Representative Michael Castle, Chairman of the Subcommittee on Education Reform. *See* Pl.'s Mem., Ex. 3. NHSA contends that the survey exceeds HHS's authority to require information from grant recipients, that demanding completion of the survey amounts to a retroactively-imposed additional requirement made without notice or opportunity for comment, and that the results of the survey will be used by actors in Congress or others unconstitutionally to malign the reputations of highly-compensated Head Start program directors. NHSA challenges HHS's action in issuing the survey as arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 *et seq.*, and in violation of NHSA members' constitutional rights.

### BACKGROUND

Because the Head Start Act technically expired on September 30, 2003, a continuing resolution currently provides funding for the Head Start apparatus. Political measures to overhaul the system have been underway for over a year, and a bill on the issue has passed the House. *See* School Readiness Act, H.R. 2210, 108th Cong. (1st Sess.2003). A bill to reauthorize the Head Start Act has been reported out of by the Health, Education, Labor, and Pensions Committee of the Senate and currently awaits a floor vote. *See* Head Start Improvements for School Readiness Act, S.1940, 108th Cong. (1st Sess.2003).

In the midst of Congressional debate about the future of Head Start, on October 2, 2003, Representatives Boehner and Castle wrote to Secretary Thompson to express their concern over potential administrative misuse of Head Start funds. Pl.'s Mem., Ex. 3. Specifically, their letter noted a recent article in the *San Antonio Express–News* about a Head Start program at which five senior administrative officers received six-figure salaries and enjoyed sizeable stipends for car allowances and out-of-town travel to attend conferences. The letter requested that HHS "conduct a review of the financial management of Head Start grantees nationwide," and "provide a detailed categorical analysis that shows exactly how Federal Head Start dollars are spent at the local level." *Id.* Additionally, the letter requested "the salaries and benefits of the top 25 Head Start executives and the amount of their salary and benefits financed using Federal Head Start dollars," as well as "the amount of money spent by the 25 grantees spending the most Federal Head Start dollars on meetings and conference travel." *Id.* The Members expressed their awareness of existing Head Start financial

reporting requirements, but contended that "in light of recent reports ... some additional scrutiny of grantees' financial records may be warranted. We anticipate that the information needed for such a review will be readily accessible, but please inform us if additional statutory authority is necessary to adequately evaluate grantees' use of Federal Head Start dollars." *Id.*

HHS responded to the letter from the Committee and Subcommittee Chairmen by soliciting expedited approval of an emergency information collection from the Office of Management and Budget ("OMB"). *See* Head Start Survey Under Emergency Review by the Office of Management and Budget, 68 Fed.Reg. 64,351 (Nov. 13, 2003). The OMB notice of review estimated that the survey would impose nine burden-hours on each of the approximately 2,700 recipients (a total of 24,300 burden-hours), and directed "comments and suggestions about the information collection described" to an OMB official. *Id.* OMB approved the HHS request on or about December 22, 2003, after receiving comments from NHSA. Compl. ¶ 37.

HHS's "Head Start Survey of Salaries and Other Compensation" was issued on December 22, 2003. Pl.'s Mem., Ex. 4. Invoking the joint inquiry of Representatives Boehner and Castle, as well as its authority under 42 U.S.C. § 9842 "to access ... program records," HHS required all Head Start programs to complete the survey regarding the compensation of their senior managers by January 22, 2004.[1] *Id.* The survey, three and a half

pages in length, is to be completed on-line, with supporting tax forms and budget documents submitted by mail. It requires, for the last three grant years, eighteen categories of compensation information for the Executive Director and Head Start Director of each program, the portion of their compensation paid from Head Start funds, total out-of-town travel expenses, and administrative expenses as a percentage of all program costs. Pl.'s Mem., Ex. 5.

### *ANALYSIS*

■■■ Whether a temporary restraining order or a preliminary injunction shall be awarded rests in the sound discretion of the trial court. *Ambach v. Bell,* 686 F.2d 974, 979 (D.C.Cir.1982).[2] However, "[a] preliminary injunction [or temporary restraining order] is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (quoting 11A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948, pp. 129–130 (2d ed.1995)); *see also Michael,* 260 F.Supp.2d at 25. To demonstrate entitlement to a preliminary injunction or temporary restraining order, a litigant must show "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Mova Pharm. Corp. v. Sha-*

---

1. This action was filed late on the afternoon of January 14, 2004. The Court held a scheduling conference via telephone the next morning and, after conversations between the parties failed to yield an accommodation, a hearing on the motion for a temporary restraining order was held on January 16,

2004. Post-hearing briefs were received from the parties on the next business day, January 20, 2004.

2. The standard is the same for either form of emergency relief. *See Michael v. United States,* 260 F.Supp.2d 23, 25 (D.D.C.2003).

*lala,* 140 F.3d 1060, 1066 (D.C.Cir.1998); *accord Taylor v. Resolution Trust Corp.,* 56 F.3d 1497, 1505–06 (D.C.Cir.1995); *Washington Area Metro. Transit Comm'n v. Holiday Tours, Inc.* 559 F.2d 841, 843 (D.C.Cir.1977). These factors must be balanced against each other, but it is especially important for the movant to demonstrate a likelihood of success on the merits. *See Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 360, 366 (D.C.Cir.1999); *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995).

## A. NHSA's Likelihood of Success on the Merits

▉▉▉ As a threshold matter, HHS now argues that issuance of the survey does not amount to final agency action subject to judicial review under the APA. The Court is inclined to agree. "As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal citations omitted); *see also Harris v. FAA,* 353 F.3d 1006 (D.C.Cir.2004). It is unclear how merely sending out an information-gathering survey manifests a settled policy decision by HHS as would, for example, the adoption of a rule. The promulgation of the survey itself thus does not seem to "constitute[ ] an unequivocal statement of the agency's position" on an issue "sufficient to meet the first requisite for final agency action." *Harris,* 353 F.3d at 1010 (quoting *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,* 324 F.3d 726, 734 (D.C.Cir.2003)). Nor, notes

HHS, has NHSA identified what precise legal consequence would flow to a Head Start program from the survey (or from electing not to submit the survey). Rather, failure to tender the information sought in the survey would "merely subject[ ] the Head Start grantee to the *potential* of an administrative process allowed under the agency's regulations, which *may* result in a sanction being imposed." Def.'s Opp. at 7 (emphasis supplied).

In reply, NHSA directs the Court to *National Family Planning and Reproductive Health Association v. Sullivan,* 979 F.2d 227, 234 (D.C.Cir.1992). There, the Court of Appeals held that HHS's announcement of new "directives" regarding abortion counseling significantly altered the meaning of existing regulations, and thus, that their adoption was not exempt from notice and comment rulemaking. *Id.* at 228. The present case is readily distinguished. It cannot be said that the survey alters the meaning of the existing financial reporting requirements faced by Head Start grantees in the same way that the sea-change in abortion counseling guidelines at issue in *National Family Planning* did. The survey marks no departure from HHS's policy of broad access to grantee records; it does not repudiate and is easily reconcilable with existing agency policy. *See id.* at 235. The requirement to complete the survey and the modest cost it imposes cannot be said to change "the terms and conditions of currently existing grants by adding a new requirement." Pl.'s Rep. at 1. In short, NHSA has not, at this juncture, made a convincing showing that the promulgation of the survey amounts to final agency action subject to judicial review under the APA.

NHSA next contends that HHS regulations do not authorize—and in fact bar—the survey. Pl.'s Mem. at 17. The Head Start Act provides that HHS "shall have

access for the purpose of audit and examination to any books, documents, papers, and records of the recipients that are pertinent to the financial assistance received under this subchapter." 42 U.S.C. § 9842(b); *see also* 45 C.F.R. § 74.53(e) ("HHS awarding agencies ... have the right of timely and unrestricted access to any books, documents, papers, or other records of recipients that are pertinent to the awards, in order to make audits, examinations, excerpts, transcripts and copies of such documents. This right also includes timely and reasonable access to a recipient's personnel for the purpose of interview and discussion related to such documents."). Furthermore, HHS is explicitly authorized to "take such action as may be necessary to assure that persons employed in carrying out" Head Start programs

> shall not receive compensation at a rate which is ... in excess of the average rate of compensation paid in the area where the program is carried out to a substantial number of the persons providing substantially comparable services, or in excess of the average·rate of compensation paid to a substantial number of the persons providing substantially comparable services in the area of the person's immediately preceding employment, whichever is higher.

42 U.S.C. § 9848(1).

HHS regulations elaborate extensive financial record-keeping and reporting requirements consistent with those objectives. *See* 45 C.F.R. §§ 74.52, 74.53. NHSA rests heavily on 45 C.F.R. § 74.52, which describes the forms to be used by Head Start grantees for submitting information to HHS and the frequency with which they must be submitted. The regulations also specify that "HHS shall not impose additional or inconsistent requirements except as provided in Sections 74.4 and 74.14, or unless specifically required

by Federal statute or executive order." 45 C.F.R. § 74.1. Section 74.14 deals with the imposition of special award conditions on poorly managed individual programs and is thus inapposite here. But Section 74.4 provides that "HHS awarding agencies may apply more restrictive requirements to a class of awards or recipients when approved by the [HHS Office of Grants and Acquisition Management], after consultation with the OMB." 45 C.F.R. § 74.4(a).

NHSA argues that the survey amounts to an additional requirement imposed on Head Start grantees without notice or opportunity for comment. On its face, they contend, the survey exceeds the bounds of Section 9842 by requiring disclosure of non-Head Start expenditures: it inquires into the salaries of grantee personnel without regard to whether such salaries are paid from sources other than Head Start awards. NHSA also argues that HHS retention and access requirements effectively bar the survey in that, while they admittedly require grantees to submit (rather than merely keep) certain financial records, the regulations also restrict the imposition of additional reporting requirements to limited circumstances—namely, when "needed to comply with legislative requirements" or where "a recipient's accounting system does not meet standards." Pl.'s Mem. at 17; *see* 45 C.F.R. § 74.52(b)(1), (b)(2).

None of these statutory arguments persuade the Court that NHSA is substantially likely to succeed on the merits in this case. As an initial matter, NHSA conceded at the hearing on this motion that OMB approved the survey before it was promulgated. *See also* Compl. ¶ 37. The Court thus strains to see how "consultation with OMB" is wanting here. *See* 45 C.F.R. § 74.4(a). NHSA insists that OMB's approval of the survey does not fit

within the ambit of Section 74.4(a) in that HHS's request was not a "deviation" to which that section applies. But NHSA cannot have it both ways: either the survey is an additional requirement that deviates from established agency regulatory requirements (and is thus subject to Section 74.4(a)), or it is not (and is therefore neither subject to Sections 74.1(c) and 74.4(a) nor a legally consequential, final agency action subject to judicial review).

Moreover, the Court is not persuaded that the survey exceeds the bounds of 42 U.S.C. § 9842 by requiring disclosure of non-Head Start expenditures. That provision requires access by HHS to materials *"pertinent* to the financial assistance received" by Head Start grantees, not just to materials that directly document such expenditures. 42 U.S.C. § 9842(b) (emphasis supplied). Surely the administrative expenses of Head Start programs, including the salaries of senior officials, are pertinent to the financial assistance the programs receive from HHS. The Head Start Act elsewhere confirms as much by specifically empowering HHS to "take such action as may be necessary to assure that persons employed" by Head Start programs are not excessively compensated. 42 U.S.C. § 9848; *see also* 42 U.S.C. § 9846(a)(7) (including the salaries of Head Start staff among subjects to be discussed "at least once during every two-year period" in an HHS report to the House Committee on Education and the Workforce and the Senate Committee on Labor and Human Resources).

Nor is the Court persuaded that the information retention, access, and reporting provisions bolster NHSA's case. There is little if any analytical difference between requiring "timely and reasonable access to a recipient's personnel for the purpose of interview and discussion" related to a grantee's finances, 45 C.F.R.

§ 74.53(e), and the survey at issue. Indeed, the only difference may be that the former procedure would entail a larger administrative expenditure of Head Start funds—precisely what NHSA purportedly seeks to avoid in bringing this action. NHSA leans heavily on 45 C.F.R. § 74.52(b), which delineates rules to be observed when HHS "needs additional information or more frequent reports." But certainly that provision does not, as NHSA contends, "explicitly prohibit the survey." Pl.'s Mem. at 17. Reading the regulation to limit all permissible communications between HHS and Head Start grantees to those "needed to comply with legislative requirements" or made "when HHS determines that a recipient's accounting system does not meet" agency standards would eviscerate HHS's comprehensive right of timely and unrestricted access to grantee records. *See* 45 C.F.R. § 74.53(e). Such a reading would also be inconsistent with what appears to be HHS's broad statutory duty to monitor and report upon the finances of Head Start grantees. *See* Def.'s Opp. at 2, 7; 42 U.S.C. §§ 9846(a)(7), 9846(a)(11), 9848.

Similarly unavailing is NHSA's argument that the survey impermissibly imposes a burdensome, retroactively-effective requirement without notice or opportunity for comment. NHSA's reliance on *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17–28, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), and *Bennett v. New Jersey*, 470 U.S. 632, 640–41, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985), is misplaced. In *Pennhurst*, the Supreme Court held that a provision creating a federal-state grant program to aid developmentally disabled individuals did not bestow on disabled individuals any substantive rights to "appropriate treatment" in the "least restrictive environment." 451 U.S. at 18, 101 S.Ct. 1531. On its way to that conclusion, the Court noted that

legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal public moneys, it must do so unambiguously.

*Id.* at 17, 101 S.Ct. 1531. In *Bennett,* the Supreme Court held that substantive amendments to Title I of the Elementary and Secondary Education Act did not apply in determining whether a local public school district had misused Title I funds in previously-made grants.

Leaving aside for the moment the fact that not all Head Start grantees are organs of the States, it is manifest that the conditions contemplated by the Supreme Court in *Pennhurst* bear little resemblance to the requirements of the survey at issue here. HHS's survey imposes no unforseen duties on Head Start programs. Given the clear authority of HHS to access the financial information of grantees, *see* 45 C.F.R. § 74.53(e), it cannot be said that the survey works a change "in the substantive standards governing [a] federal grant program[ ]," or that it denies Head Start programs "fixed, predictable standards for determining if expenditures are proper." *Bennett,* 470 U.S. at 640–41, 105 S.Ct. 1555. Because it does not discernibly alter the bargain facing organizations that enjoy Head Start funding, the survey does not impermissibly impose a substantive retroactive condition.

■ NHSA's constitutional argument merits only brief discussion. Although Head Start program directors may have some reasonable expectation of privacy in their salaries, *see Painting and Drywall Work Preservation Fund, Inc. v. Dep't of Housing and Urban Dev.,* 936 F.2d 1300, 1302–03 (D.C.Cir.1991), no director's "good name, reputation, honor, or integrity is at stake because of what [HHS] is doing to him" by administering the survey. *Bd. of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Rather, NHSA would have the Court conclude that HHS is complicit in a scheme to malign Head Start programs and their directors, and should thus be held accountable for the potential misuse of the information collected by the survey. *See* Pl.'s Mem. at 19. But legally available information is often taken out of context or otherwise maliciously deployed in the political rough-and-tumble of Washington. All that is legitimately challenged here is the action of HHS in collecting readily-available data from program participants in order to respond to a congressional inquiry. The Court is not persuaded that HHS's act of data collection consistent with agency regulations amounts to an infringement of anyone's Fifth Amendment rights.

## B. Irreparable Harm to NHSA

■ Similarly, the Court rejects NHSA's argument that the HHS survey will cause irreparable harm to Head Start programs by generating information that, because it is arguably devoid of context, may be misused. It is not clear just what HHS will provide to Congress, since the relevant contextual information certainly is known to HHS. NHSA is free, in any event, to respond to any perceived mischaracterizations of the information collected in HHS's survey. Indeed, it expressed such objections to the survey during the OMB approval process. *See*

Compl. ¶¶ 35, 36; Pl.'s Mem., Ex. 9, 10. One likely effect of the survey is that some funds which could otherwise have been used for Head Start programming will be consumed by administrative expenses. However, in the face of Head Start's proposed $6.87 billion annual budget, Pl.'s Mem., Ex. 3, even NHSA's estimate of the cost of compliance with the HHS survey—a total of over $1 million, but only a few hundred dollars per program—is not especially high. It is not, the Court concludes, the significant and irreparable loss required to support a temporary restraining order or preliminary injunction. *See Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir. 1985) ("[T]he injury must be both certain and great; it must be actual and not theoretical. Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.") (emphasis original) (internal citations omitted).

### C. Injury to Other Interested Parties

 Enjoining the survey would force HHS to cull the information requested by Representatives Boehner and Castle from other available sources. While the parties agree that HHS might be able to assemble from existing records information roughly comparable to what the survey would yield, HHS insists that its statutory responsibility to oversee Head Start grantees would be thwarted were the Court to issue an injunction in this case. Since the Court agrees with HHS that the survey falls within the scope of its authority under 42 U.S.C. § 9842(b) and 45 C.F.R. Part 74, the Court also concludes that the injunction sought by NHSA would unduly, if not tremendously, restrain HHS authority.

### D. Public Interest

 The public has a strong interest in the effective and transparent administration of federal grant programs. That interest may well be served by confirming HHS's authority to review the administrative expenditures of Head Start grant recipients. On the other hand, the Court is mindful of the interests of NHSA program directors, and agrees that a campaign to discredit Head Start programs as profligate would be an unfortunate use of the information to be gathered in the HHS survey. There is scant evidence before the Court that HHS will engage in such conduct. Moreover, the Court cannot conclude on the existing record that such a campaign is the only potential use of the information sought, and thus finds that the public's interest in transparency is predominant.

### *CONCLUSION*

Because NHSA has not established that it is substantially likely to succeed on the merits of its claims, and has failed to make a sufficiently strong showing with respect to the other applicable factors to turn the tide in its favor, *see Davenport*, 166 F.3d at 366, the Court concludes that the motion for a temporary restraining order should be denied. A separate order has been issued on this date.

### *ORDER*

Upon consideration of plaintiff's motion for a temporary restraining order, and for the reasons stated in the memorandum opinion issued on this date, it is this *20th* day of January, 2004, hereby ORDERED that the motion is DENIED.