**C. Peyton BARTON, Jr.
et al., Plaintiffs,**

v.

**DISTRICT OF COLUMBIA
et al., Defendants.**

**No. CIV.A.00–0174 (RMU).**

United States District Court,
District of Columbia.

Feb. 28, 2001.

C. Michael Tarone, McDonald and Karl, Washington, DC, for Plaintiffs.

ACC Charles B. Barksdale, D.C. Corporation Counsel's Office, Washington, DC, for District Defendants.

Richard L. Aguglia, Hunton & Williams, Washington, DC, for Wharf Defendants.

### MEMORANDUM OPINION

DENYING THE PLAINTIFFS' MOTION FOR
A PRELIMINARY INJUNCTION

URBINA, District Judge.

## I. INTRODUCTION

C. Peyton Barton, Jr. and Maine Avenue Seafood, Inc. ("the plaintiffs") move the court for a preliminary injunction to prevent the District of Columbia and its agents ("the District defendants" or "the D.C. defendants") from entering into or awarding any lease contracts for a waterside or land-based slot at the Municipal Fish Wharf ("the Wharf").[1] Mr. Barton, a commercial tenant, runs a seafood concession out of the Fish Market Building at the Wharf, located at 1100 Maine Avenue, S.W., on the Southwest D.C. waterfront. He now asks the court to prevent the District defendants from entering into any 30–year leases with other commercial seafood vendors at the Wharf ("the Wharf defendants"[2]).

Specifically, the plaintiffs allege that by reaching agreement on these leases with the Wharf defendants, the D.C. defendants violated the D.C. Procurement Practices Act, *de facto* prevented the plaintiffs from making a lease contract, violated the Equal Protection clause, violated the plaintiffs' rights granted by Congress's Fiscal Year 1999 Appropriations law, and engaged in

---

1. Although the plaintiffs brought their motion as one for a temporary restraining order and a preliminary injunction, the court said it would treat the motion as a motion for a preliminary injunction. *See* Order dated Jan. 29, 2001. The court based its decision on the fact that the District defendants filed a praecipe, representing that they would take no final action on the contracts until January 31, 2001. *See* District Defs.' Supp'l Praecipe, dated Jan. 26, 2001. Since that time, the District defendants have filed an additional praecipe, representing that they would take no final action on the contracts until February 5, 2001. *See* District Defs.' Second Supp'l Praecipe, dated Jan. 30, 2001. On Monday, February 5, 2001, the court informed the parties via teleconference that the court would deny the plaintiffs' motion for a preliminary injunction.

2. The Wharf defendants include the following parties: Billy White, Sunny White, B.R.W., Inc., Benjamin Edwards, and Darryl Vincent Jones. Both the Wharf defendants and the District defendants have filed oppositions to the plaintiffs' motion for a preliminary injunction.

reverse discrimination. The defendants counter by noting that the plaintiffs have presented weak arguments on all four prongs of the standard preliminary-injunction test (*see* Section III.A. *infra*). Accordingly, they argue that the court should deny the plaintiffs' motion for injunctive relief.

For the reasons that follow, the court will deny the plaintiffs' motion for a preliminary injunction.

## II. BACKGROUND

C. Peyton Barton, Jr. is the sole stockholder of Maine Avenue Seafood, Inc. ("MAS"), a business that sells cooked and fresh seafood at the Wharf, located at 1100 Maine Avenue, S.W., on the Southwest waterfront. *See* First Am. Compl. ("Compl.") at 3. Mr. Barton leases a land-based location from the District at the Wharf consisting of a small building (the Fish Market Building) and parking area. *See id.* at 4. The United States government owns the Wharf, and the District manages the area. *See id.*

In 1996, Mr. Barton purchased the assets of Morgan Seafood, a bankrupt concessionaire, resulting in the assignment to him of two lease agreements for a land-based location at the Wharf. *See* Mot. for P.I. at 4. Mr. Barton states that the District recognized the assignments. *See id.*

The assignments Mr. Barton received were part of a joint lease with other Wharf vendors. *See* Wharf Defs.' Opp'n to Mot. for P.I. ("Wharf Defs.' Opp'n") at 5. Since the joint lease expired in 1996, all of the concessionaires—including the plaintiffs—have operated in their same locations under month-to-month leases. *See id.* In their opposition, the Wharf defendants say they have been negotiating for a new long-term lease with the District since 1995, and that they focused their negotiations on the prospect of a new 30–year lease in late 1998. *See id.*

The record in this case exposes a long history of hostility between the plaintiffs and some of the Wharf defendants. Mr. Barton believes the animosity started in 1996 when he successfully bid to acquire the assets of Morgan Seafood, beating out Mr. Billy White, one of the Wharf defendants and a co-owner of B.R.W., Inc. Mr. Barton's First Amended Complaint underscores the history of ill will at the Wharf:

> There are 16 commercial vending locations at the Wharf, each of which is properly considered a concession granted by the District. These concessions are jealously guarded by the current vendors, and in recent years there has been a consolidation of ownership of those businesses. Today, defendant B.R.W., Inc. ("BRW") is by far the largest and most powerful concessionaire .... The BRW defendants, who have long boasted of their political and economic prowess, are known for their predatory and aggressive competitive practices in this government-controlled outdoor market place .... There are but five concessionaires: the BRW defendants; the Evans Family; an unrelated family with the name Evans; Edwards and Jones; and Barton.

> Barton became a concessionaire in 1996 when he beat out the BRW defendants for purchase of a defunct Wharf concessionaire. Ever since that time, the BRW defendants have tried to put Barton out of business, no holds barred, in order to monopolize the fried cooked seafood market at the Wharf where Barton is their only competitor.

Compl. at 4–5. In addition, the plaintiffs mention the Wharf defendants' "hatred for Barton" as a motivating factor in their alleged desire to destroy Mr. Barton's business. *See* Mot. for P.I. at 2.

The Wharf defendants respond in kind. Indeed, they open the "Factual Background" section of their opposition to the plaintiffs' motion with the following salvo: "This is not the first frivolous position that Barton has taken in this Court with regard to a Wharf lease between the District and

the Wharf Defendants." Wharf Defs.' Opp'n to Mot. for P.I. at 4.

The roots of the current dispute can be traced to a provision in the Congressional Appropriations Act for Fiscal Year 1999. *See* Pub.L. No. 105–277, 112 Stat. 2681 (1998) ("FY99 Act"). The FY99 Act required the District to negotiate new 30–year leases with the vendors currently leasing concession slots at the Wharf. *See* Mot. for P.I. at 5; Wharf Defs.' Opp'n at 7. Accordingly, the plaintiffs believe that "Barton was one of the intended beneficiaries of that legislation." Mot. for P.I. at 5.

In the FY99 Act, Congress also appropriated $3 million for improvements to the District's Southwest Waterfront area, which encompasses the Wharf, on the condition that the District enter into 30–year leases with existing lessees. *See* Wharf Defs.' Opp'n at 7, n. 4. The FY99 Act directed the Army Corps of Engineers to develop a plan for how best to spend the $3 million to improve the Wharf. *See id.;* District Defs.' Opp'n at 4–5.

Importantly, though, the Congressional Appropriations Act for Fiscal Year 2000, Pub.L. No. 106–113, 113 Stat. 1501 (1999) ("FY00 Act"), changed the terms of the Southwest Waterfront area project, eliminating the requirement that the District execute long-term leases with all existing lessees (with the exception of lessees of "the Marina," which does not include the Municipal Fish Wharf). *See* District Defs.' Opp'n at 5, Ex. A6; Pls.' Reply to District Defs.' Opp'n at 10.

The third and final Congressional Appropriations Act that bears on this dispute is the Fiscal Year 2001 Act. *See* Pub.L. No. 106–522, 114 Stat. 2440 (2000) ("FY01 Act"). Citing section 162 of the FY01 Act, the District defendants note that Congress gave the Mayor of Washington, D.C. "exclusive authority to approve and execute leases" for slots at the Municipal Fish Wharf. *See* District Defs.' Opp'n at 5. Section 162 provides, in pertinent part:

(a) Exclusive Authority of the Mayor

Notwithstanding section 451 of the District of Columbia Home Rule Act or any other provision of District of Columbia or Federal law to the contrary, the Mayor of the District of Columbia shall have the exclusive authority to approve and execute leases of the Washington Marina and the Washington municipal fish wharf with the existing lessees thereof for an initial term of 30 years, together with such other terms and conditions (including renewal options) as the Mayor deems appropriate.

District Defs.' Opp'n at 5 (citing the FY01 Act, § 162).

As discussed below, a principal point of contention between the parties is whether this trilogy of Congressional Appropriations Acts or the D.C. Procurement Practices Act (D.C.Code § 1–1181.1 *et seq.*) ("PPA") controls the process involving leases for the Wharf. The plaintiffs contend that the District "totally sidestepped" the PPA in making leases with the other Wharf vendors. *See* Mot. for P.I. at 15. The District defendants counter that the plaintiffs' PPA argument is "flawed" because § 162 of the FY01 Act trumps the PPA and because the PPA does not apply to contracts for leases. *See* District Defs.' Opp'n at 6.

Meanwhile, in mid–1999, the District accepted the recommendation of the Army Corps of Engineers to demolish the Fish Market Building—occupied by Mr. Barton—as part of the renovation plan. *See* Wharf Defs.' Opp'n at 7. According to the Wharf defendants, "Not only was the dilapidated structure an eyesore, but it was situated so as to clog pedestrian and vehicular traffic." *Id.*

The plaintiffs characterize what happened next as follows:

The District met and negotiated contracts with all vendors except Barton. From the very outset of the negotiation process, starting in October or November 1998, Barton fulfilled every request the District made of him in the expecta-

tion that it would be a period of good faith negotiations. While Barton was led to believe he would be awarded a 30–year contract, that was not in reality what the District had in mind. The record will reflect that the District permitted the entire contracting process to be infected by bitter, hostile and unlawful interference by the BRW and Virgo defendants and their attorneys.

*Id.* (internal citations omitted). In essence, Mr. Barton claims that the District cut him out of the negotiation process, thereby creating two classes of vendors at the Wharf: Barton, who is not being awarded a contract, and the four other vendors, who are being awarded contracts. *See id.* at 6. As evidence of the District defendants' distaste for Mr. Barton, the plaintiffs include an affidavit from Mr. Barton stating that defendant Carl Johnson, a Department of Housing and Community Development ("DHCD") official told him, "White trash, you are out of here." *See* Mot. for P.I ., Barton Aff. at 5; *see also* Reply to District Defs.' Opp'n, Johnson Aff. at 1.

Unsurprisingly, the Wharf defendants see things differently. They claim that in December 1998 District officials sent all the vendors a draft of a proposed joint lease that included the Wharf defendants, the plaintiffs, and other vendors as lessees. *See* Wharf Defs.' Opp'n at 5. The Wharf defendants rejected this joint lease because they did not want to be held jointly and severally liable for any unpaid rent by the plaintiffs when the District had to sue Mr. Barton for non-payment of rent in 1998 and, in their view, Mr. Barton had failed to pay his fair share of expenses common to all Wharf vendors, such as lighting, security, and garbage removal. *See id.* at 6.

The District defendants offer their own explanation for not entering into a new lease agreement with the plaintiffs, namely, "the City did try to negotiate a new lease with Mr. Barton, but he simply re-

fused." *See* District Defs.' Opp'n to Mot. to P.I. ("D .C. Defs.' Opp'n") at 10. In support of this contention, the District includes affidavits from Robert Jones, who works for the Downtown Business Improvement District, and Joseph Wolfe, who works for the DHCD.[3] *See* D.C. Defs.' Opp'n, Exs. A and B. In their affidavits, Mr. Jones and Mr. Wolfe both assert that the District engaged in good-faith negotiations about leasing Mr. Barton slots 16 and 17 at the Wharf so he could keep his business there under a 30–year lease. *See id.* On August 4, 1999, the District sent Mr. Barton's former lawyer, Mark Gilday, a draft lease for a 30–year period for slots 16 and 17 at the Wharf. *See id.,* Ex. A at 5; *see also* Ex. A7 (copy of draft lease).

Once again, the parties differ over what happened next.

Mr. Barton viewed the draft agreement the District sent him in August 1999 as follows:

> The draft agreement related to the very slots occupied by the Evans Family. To me, that meant trouble. All the vendors at the Wharf believed that they had preferential rights to occupy their current locations and that the District could not take those locations from them. The District, to my knowledge, never said anything to me to the contrary.

Mot. for P.I., Barton Aff., at 4. Mr. Barton claims that from December 1998, when he first received a draft lease, through September 1999, he always attempted to negotiate with the District in good faith. *Id.* at 5.

Conversely, Mr. Jones states on behalf of the District defendants that in late August 1999, Mr. Barton called him and said, "them boys ain't gonna move," apparently referring to the Evans family (another of the named defendants who are vendors at the Wharf). *See* District Defs.' Opp'n, Ex. A. at 6. According to Mr. Jones, the plaintiffs were under the misconception that the Evans family had some right to slots 16

**3.** Both of these men are also named as defen- dants in this case.

and 17. *See id.* Mr. Jones states that he disabused Mr. Barton of this notion on several occasions, but that "My indications to Mr. Barton were to no avail. He simply refused thereafter to consider leasing wharf spaces 16 and 17. These were the only unoccupied spaces I had available to lease to Mr. Barton. He refused to even engage in further negotiations regarding leasing these wharf spaces." *Id.*

What happened after Mr. Barton's negotiations with the District fell through is undisputed. On September 17, 1999, the District sent Mr. Barton a termination letter informing him that he had to vacate the premises by November 1, 1999. *See* District Defs.' Opp'n, Ex. A at 6. When Mr. Barton refused to vacate, the District brought a landlord-tenant eviction proceeding against him in D.C. Superior Court on November 23, 1999. *See* Mot. for P.I. at 3.[4] On April 12, 2000, that court granted the District's motion for summary judgment. *See id.* That decision is now on appeal to the D.C. Court of Appeals. *See id.*

On January 31, 2000, Mr. Barton filed his complaint in this action, asserting that only a federal court could grant full relief on his important federal claims. *See id.* On January 16, 2001, he filed his motion for a preliminary injunction. Both the D.C. defendants and the Wharf defendants filed oppositions, and Mr. Barton filed a reply to each brief.

## III. DISCUSSION

### A. Legal Standard for Preliminary Injunctive Relief

■ This court may issue a preliminary injunction only when the movant demonstrates that:

(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will not substantially injure the other party; and (4) the public interest will be furthered by an injunction.

*Davenport v. International Bhd. of Teamsters,* 166 F.3d 356, 361 (D.C.Cir.1999); *see also World Duty Free Americas, Inc. v. Summers,* 94 F.Supp.2d 61, 64 (D.D.C. 2000). These four factors are not considered in isolation from one another, and no one factor is necessarily dispositive as to whether preliminary injunctive relief is warranted. *See CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C.Cir.1995). Rather, the factors "interrelate on a sliding scale and must be balanced against each other."[5] *Davenport,* 166 F.3d at 361 (citing *Serono Labs. v. Shalala,* 158 F.3d 1313, 1317–18 (D.C.Cir.1998), *on remand,* 35 F.Supp.2d 1 (D.D.C.1999)); *see also WMATA v. Holiday Tours, Inc.,* 559 F.2d 841, 842–43 (D.C.Cir.1977) (court "examines each requirement in light of the others to determine whether an injunction would be proper").

Thus, a particularly strong showing on one factor may compensate for a weak showing on one or more of the other factors. *See Serono Labs.,* 158 F.3d at 1318. For instance, as to the first factor, "The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, [the court] may grant [an injunction] even though its own approach may be contrary to [the mov-

---

**4.** This case was *District of Columbia v. Barton,* Dkt. No. L & T 051941 99 (D.C.Super.1999) (Diaz, J.).

**5.** When a party seeks an injunction to reverse policies that are already in place, "the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction." *See Columbia Hosp.*

*for Women Found. v. Bank of Tokyo–Mitsubishi, Ltd.,* 15 F.Supp.2d 1, 4 (D.D.C.1997) (citation omitted), *aff'd,* 159 F.3d 636 (D.C.Cir. 1998) (table, text in Westlaw); *see also Alaska Excursion Cruises, Inc. v. United States,* 595 F.Supp. 14, 18 (D.D.C.1984) (attempt to alter *status quo,* rather than preserve it, must be supported by showing that "the facts and law clearly support" such a change).

ants'] view of the merits. The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors." *New Mexico v. Richardson,* 39 F.Supp.2d 48, 50 (D.D.C. 1999) (quoting *Holiday Tours,* 559 F.2d at 843). A strong showing of likely success on the merits may warrant issuance of preliminary injunctive relief even if the plaintiff makes a less compelling showing on the other three factors. *See Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958) ("injury held insufficient to justify a stay in one case may well be sufficient to justify it in another, where the applicant has demonstrated a higher probability of success on the merits."); *National Wildlife Fed'n v. Andrus,* 440 F.Supp. 1245, 1256 (D.D.C.1977) (enjoining further construction on dam power plant, despite dispute over irreparable injury, because "the court is convinced by plaintiffs' argument on the merits and therefore finds it sufficient on the question of irreparable injury . . .").

If the plaintiff makes a particularly weak showing on one factor, however, the other factors may not be enough to "compensate." *See Taylor v. RTC,* 56 F.3d 1497, 1506 (D.C.Cir.), *amended o.g. on reh'g,* 66 F.3d 1226 (D.C.Cir.1995). It is particularly important for the plaintiff to demonstrate a substantial likelihood of success on the merits. *Cf. Benten v. Kessler,* 505 U.S. 1084, 1085, 112 S.Ct. 2929, 120 L.Ed.2d 926 (1992) *(per curiam );* *University of Texas v. Camenisch,* 451 U.S. 390, 394, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 934, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). If the plaintiff fails to make this showing, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor." *Davenport,* 166 F.3d at 367; *see, e.g., National Pharm. Alliance v. Henney,* 47 F.Supp.2d 37, 41 (D.D.C.1999) ("Here, because the likelihood of success is slim, plaintiffs would have to make a very substantial showing of severe irreparable injury in order to prevail on their mo-

tion."). Indeed, absent a "substantial indication" of likely success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *American Bankers Ass'n v. National Credit Union Admin.,* 38 F.Supp.2d 114, 141 (D.D.C.1999) (quoting *Holiday Tours,* 559 F.2d at 843).

In addition, any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown. *See National Treasury Employees Union v. Yeutter,* 918 F.2d 968, 977 (D.C.Cir.1990) (citation omitted).

■ Finally, because preliminary injunctions are extraordinary forms of judicial relief, courts should grant them sparingly. *See Moore v. Summers,* 113 F.Supp.2d 5, 17 (D.D.C.2000); *Varicon Int'l v. Office of Personnel Mgmt.,* 934 F.Supp. 440, 442 (D.D.C.1996) (Urbina, J.). Although the trial court has the discretion to issue or deny a preliminary injunction, it is not a form of relief granted lightly. *See Ambach v. Bell,* 686 F.2d 974, 979 (D.C.Cir.1982). As the Supreme Court has said, "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).

## B. Analysis

In this case, the plaintiffs challenge the lease-making process on a number of fronts. The court concludes that while the plaintiffs have merely a questionable chance of success on the merits on their PPA claim, their other claims totally lack merit. Moreover, they present a weak case on the other three prongs of the preliminary-injunction test. Specifically, the plaintiffs have not shown irreparable harm, they have not shown that an injunction would not harm the other parties, and

they have not shown that the public interest would be furthered by an injunction. Accordingly, the court will deny the plaintiffs' motion for a preliminary injunction.

### 1. The Plaintiffs Have Merely a Questionable Likelihood of Success on the Merits [6]

#### a. The PPA Claim

 The plaintiffs' first claim—the only one with even a questionable likelihood of success on the merits—is that the District "totally sidestepped" the D.C. Procurement Practices Act ("PPA") in making leases with the other Wharf vendors. *See* Mot. for P.I. at 15. The District defendants counter that the plaintiffs' PPA argument is "flawed" because section 162 of the FY01 Act trumps the PPA and because the PPA does not apply to contracts for leases. *See* District Defs.' Opp'n at 6.

As noted above, the current dispute began when Congress passed the FY99 Act, which required the District to negotiate new 30-year leases with the vendors currently leasing concession slots at the Wharf. *See* Mot. for P.I. at 5; Wharf Defs.' Opp'n at 7. In the FY99 Act, Congress appropriated $3 million for improvements to the District's Southwest Waterfront area, but only if the District entered into 30-year leases with existing lessees. *See* Wharf Defs.' Opp'n at 7, n. 4. The FY99 Act directed the Army Corps of Engineers to develop a plan for how best to spend the money and improve the Wharf. *See id.;* District Defs.' Opp'n at 4–5.

In the FY00 Act, however, Congress changed the terms of the Southwest Waterfront project, eliminating the condition that required execution of long-term leases for all existing lessees (with the exception of lessees of "the Marina," which does not include the Municipal Fish Wharf). *See*

District Defs.' Opp'n at 5, Ex. A6; Pls.' Reply to District Defs.' Opp'n at 10. Moreover, pointing to section 162 of the FY01 Act, the District defendants note that Congress gave the Mayor of Washington, D.C. "exclusive authority to approve and execute leases" for slots at the Municipal Fish Wharf. *See* District Defs.' Opp'n at 5.

The plaintiffs counter that because section 162 became law in November 2000, *after* the lease-negotiation process had occurred, the section should not be applied retroactively. As a preliminary matter, the court would tend to agree with the plaintiffs on this point. Section 162 says nothing about retroactive application. Thus, the court should not read such a meaning into the section. In addition, the fact that section 162 grants the Mayor exclusive authority to enter these leases would appear to be irrelevant to a negotiation process that took place in 1998 and 1999.

The court, however, deems the plaintiffs' other arguments on the PPA claim less persuasive. The plaintiffs allege that the District violated the PPA's requirement to follow "a duty of *'good faith'* which means *'honesty in fact in the conduct or transaction concerned ad [sic] the observance of reasonable commercial standards.'* " Mot. for P.I. at 17 (emphasis in original). Moreover, the plaintiffs assert that the District failed to follow the PPA's guidelines for awarding leases through noncompetitive negotiations by failing to state in writing why these leases would be awarded through a non-competitive bid process. *See id.* at 16–17. By failing to make such written findings, the defendants allegedly violated D.C.Code § 1–1181.6. *See id.* at 17.

---

**6.** The first component of the likelihood of success on the merits prong usually examines whether the plaintiffs have standing in a given case. *See, e.g., Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Because neither the District defendants nor the Wharf defendants argue that the plaintiffs lack standing, the court will assume *arguendo* that the plaintiffs have standing to challenge the proposed lease agreements with the other seafood vendors at the Wharf.

Let us consider these two allegations in turn. First, contrary to what the plaintiffs would have the court believe, the court finds no evidence that the District acted in bad faith in conducting the lease negotiations with the plaintiffs.[7] In contrast, it appears from the record that the District negotiated in good faith with the plaintiffs, providing the plaintiffs with ample opportunity to negotiate a 30–year lease for slots 16 and 17 at the Wharf. The District defendants offer particularly strong evidence on this point, namely, they proffer a 22–page fax of a draft lease for a 30–year contract for slots 16 and 17 that the District sent Mr. Barton's prior counsel on August 4, 1999. *See* District Defs.' Opp'n, Ex. A8.

As noted in the Background section *supra*, Mr. Barton was apparently under the mistaken impression that the Evans family had a right to slots 16 and 17. In his affidavit, Mr. Barton stated, "All the vendors at the Wharf believed that they had preferential rights to occupy their current locations and that the District could not take those locations from them. The District, to my knowledge, never said anything to me to the contrary." Mot. for P.I., Barton Aff., at 4. Mr. Barton's claim on this point rings hollow. The District did say something to Mr. Barton "to the contrary" by sending him a draft lease for *him*, not the Evans family, to enter into a 30–year contract for slots 16 and 17. Indeed, this was the best possible evidence the District could have given Mr. Barton to convey the seriousness of the District's offer.

Furthermore, Mr. Jones states on behalf of the D.C. defendants that in late August 1999, Mr. Barton called him and said, "them boys ain't gonna move," apparently referring to the Evans family. *See* D.C. Defs.' Opp'n, Ex. A. at 6. Mr. Jones said that on several occasions he disabused Mr.

Barton of the idea that the Evans had a supposed right to the property, but that his "indications to Mr. Barton were to no avail. He simply refused thereafter to consider leasing wharf spaces 16 and 17. These were the only unoccupied spaces I had available to lease to Mr. Barton. He refused to even engage in further negotiations regarding leasing these wharf spaces." *Id.*

The Wharf defendants provide further support for the District's contention that Mr. Barton unreasonably ceased all negotiations. *See* Wharf Defs.' Opp'n at 7. They note that when Mr. Barton again claimed that the Evans family held slots 16 and 17, the District's outside legal counsel sent the following e-mail to Mr. Barton's lawyer on August 10, 1999: "It is important that you impress upon your client that, if he does not undertake to negotiate in good faith for the two spaces (16 & 17) that have been offered, he may end up with no space at all." *Id.*

The court finds Mr. Barton's claim that the Evans family had a right to slots 16 and 17 patently unreasonable. In light of the August 4 faxing of the draft lease, the August 10 e-mail to Mr. Barton's former lawyer, and Mr. Jones's repeated assurances to Mr. Barton that the Evans's had no right to the property, the plaintiffs present scant evidence that the District was negotiating in bad faith. In contrast, the District appears to have given the plaintiffs several chances to ink a 30–year deal so Mr. Barton could continue to run his business at the Wharf.

In the final analysis, the plaintiffs' motion for a preliminary injunction seems to boil down to a last-ditch attempt to prevent the execution of contracts, one of which the plaintiffs could well have signed, ensuring them a continued presence on the Wharf for the next 30 years. The court can find no other explanation for the plain-

---

7. As additional evidence that the District acted in good faith, the court notes that it was the Army Corps of Engineers—not the District—that determined that the best renovation plan would involve demolishing the Fish Market Building, the site of the plaintiffs' store.

tiffs' adamant refusal to accept the draft lease other than that Mr. Barton made a gross miscalculation or that his prior counsel did not make clear to his client the importance of working out a deal with the District.

In terms of the plaintiffs' contention that the District should have articulated in writing its reasons for going through a noncompetitive negotiation process, the court determines that even if the plaintiffs could show that the District committed a technical violation of the PPA—assuming momentarily that the PPA applies in this case—the plaintiffs have failed to show that the District engaged in any bad faith that would have infected the whole process sufficiently to justify vacating the lease agreements with other vendors. For example, in *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed. Cir.1999), the court held that "[t]o prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process.... the protester must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval,* 175 F.3d at 1367; *see also Philadelphia Regent Builders v. United States,* 225 Ct.Cl. 234, 634 F.2d 569, 572–73 (1980) ("We do not favor sloppy practices nor approve of violations of the procurement regulations, but in the instant case no harm has come thereby."). In this case, the plaintiffs have failed to show that but for the alleged violation of the PPA, they had a "substantial chance" of receiving the contract award.

Finally, the parties dispute whether the PPA applies to contracts for leases. In its reply to the District defendants, the plaintiffs rely solely on one case, *McMillan Limited Partnership,* 1992 WL 695540 (D.C.C.A.B.1992), for the proposition that the PPA applies to lease contracts. But the decision by the D.C. Contract Appeals Board is distinguishable from the facts of this case. In *McMillan,* the District of Columbia's Department of Administrative Services ("DAS") first issued a request for proposal (RFP) to lease the McMillan Sand Filter Site in Washington, and then cancelled the RFP without explanation and initiated a new bidding process. *See McMillan,* 1992 WL 695540 at *1. The plaintiff in *McMillan* persuaded the Contract Appeals Board that because the DAS issued the RFP, the District made it seem that the PPA would apply and that DAS had to comply with the statute. *See id.* at 3. That is not the case here. Furthermore, the Contract Appeals Board hedged, noting in conclusion that "We recognize that the District's procurement regulations and procedures are in a process of continued development and that this issue of first impression, i.e. the application of the PPA to solicitations concerning interests in real property, requires further consideration by the Director of DAS." *Id.* at 5. Thus, the Contract Appeals Board itself did not offer a ringing endorsement of the notion that the PPA applies to all leases for real property in the District.

In response, the District defendants quote the precise language of the statute to argue that the PPA does not apply to leases and the case at bar: "This chapter *shall apply* to any contract for procurement of *goods* and *services,* including construction and legal services, but *shall not apply* to a contract or agreement receiving or making *grants-in-aid or for federal financial assistance.*" District Defs.' Opp'n at 6 (quoting D.C.Code § 1–1181.4(b)) (emphasis in original). The District defendants contend that a lease contract between the District and any tenant cannot be deemed a contract for goods and services. Moreover, the defendants argue that because the FY99 Act makes clear that Congress is providing a "grant" and/or "federal financial assistance" for a study of, and improvements to, the Southwest Waterfront, the PPA expressly states that it does not apply to leases of this type. *See id.* at 7. On a preliminary basis, the court determines that the District defen-

dants' arguments on these points are persuasive.

In sum, the plaintiffs have not convinced the court at this point that the PPA applies to the leases at issue in this case. In addition, even assuming *arguendo* that the PPA does apply, the plaintiffs have failed to show that the District defendants acted in bad faith or that the alleged violations of the PPA sufficiently taint the lease-negotiation process as to warrant voiding the leases. Accordingly, the court holds that on their PPA claim, the plaintiffs have at best a questionable likelihood of success on the merits.

### b. The Plaintiffs' Additional Claims

At this initial stage, the court determines that the plaintiffs' additional claims lack any likelihood of success on the merits.

First, the plaintiffs claim that the District *de facto* debarred Mr. Barton or "blacklisted" him. *See* Mot. for P.I. at 19. The plaintiffs contend that "The District refused to negotiate with Barton in good faith. Barton was treated differently and unfairly from the outset." *Id.* The court sees no evidence to support these claims. As noted above, the District began negotiations with Mr. Barton, an existing lessee, in late 1998, just as it did with the other vendors, and gave Mr. Barton several opportunities to accept the draft 30-year lease.

Second, the court sees little, if any, merit in the plaintiffs' claims of equal protection and due process clause violations, reverse discrimination, or a violation of 42 U.S.C. § 1983. For example, section 1983 allows courts to grant relief when a state or local official acting "under color of" state law violates a person's federally protected rights. *See, e.g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). But the plaintiffs have failed to show that any state or local officials, acting under color of state law, violated their federally

protected rights. In addition, the court concludes that the plaintiffs' claim of an Equal Protection violation based on a "class of one" lacks merit in that the plaintiffs have failed to demonstrate how the District treated them differently from the other vendors. Finally, for their reverse-discrimination claim, the plaintiffs rely on the allegation that defendant Johnson, a DHCD official, told Mr. Barton, "White trash, you are out of here." *See* Mot. for P.I. at 26. As despicable and racist as a comment like this would be, the plaintiffs fail to demonstrate that in making this alleged comment, defendant Johnson was "acting under color of" state law or that his personal view represented the official District view of Mr. Barton.

Lastly, the plaintiffs contend that the District unlawfully denied Mr. Barton the statutory rights accorded him by the FY99 Act, which supposedly required the District to negotiate a 30-year lease with him. *See id.* at 25. Even if the FY99 Act granted the plaintiffs these statutory rights—which the District defendants dispute, *see* District Defs.' Opp'n at 10—the plaintiffs cannot take refuge in this claim. The simple truth remains that the District negotiated with Mr. Barton in good faith, and for a period of about 10 months. As noted above, the court finds that the District gave the plaintiffs ample opportunity to sign a 30-year lease for slots 16 and 17 at the Wharf. Thus, the court rules that the plaintiffs' additional claims do not even remotely rise to the level of having a substantial likelihood of success on the merits.

When considering a party's motion for a preliminary injunction, the court must pay special attention to the first prong of the injunctive-relief test, for it is particularly important for the plaintiff to demonstrate a substantial likelihood of success on the merits. *Cf. Benten v. Kessler,* 505 U.S. 1084, 1085, 112 S.Ct. 2929, 120 L.Ed.2d 926 (1992) *(per curiam ); University of Texas v. Camenisch,* 451 U.S. 390, 394, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *Doran,* 422 U.S. at 934, 95 S.Ct. 2561. If the plaintiff

fails to make this showing, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor." *Davenport*, 166 F.3d at 367. In this case, the plaintiffs fail to make this showing on the other three factors.

## 2. The Plaintiffs Have Failed to Show that They Would Suffer Irreparable Harm

■ The plaintiffs argue that if the court does not issue an injunction, they will suffer irreparable harm, in that their business will be destroyed. *See* Mot. for P.I. at 26. Conceding that D.C. Circuit law clearly holds that economic loss alone does not constitute irreparable harm, the plaintiffs contend that in this case the level of harm "threatens the very existence of plaintiff's [sic] business." *See id.* (quoting *Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n*, 758 F.2d 669, ·674 (D.C.Cir.1985)).

In response, the District defendants note that the D.C. Superior Court has stayed Mr. Barton's eviction pending his appeal to the D.C. Court of Appeals. *See* District Defs.' Opp'n at 13. As the District notes, "nothing is imminent in the D.C. Court of Appeals (or the D.C. Superior Court) vis-à-vis Mr. Barton's eviction. So the question must be asked: suppose Plaintiffs' TRO/PI Motion is denied—what would be the effect? The answer is: there would be no effect." *Id.* Indeed, the court agrees there would be little effect. Even after the leases with the other vendors are executed, "Mr. Barton will still be at the rental premises, and will still be doing business. Nothing can happen to Mr. Barton or his leasehold interest while his eviction case is pending in the D.C. Court of Appeals." *Id.*

Moreover, the court deems persuasive the District defendants' argument that the plaintiffs will suffer no irreparable harm, especially when the District notes that:

> Although the Wharf is apparently where Mr. Barton would (now) like to stay, there is no reason he could not sell his seafood at some other waterfront, or non-waterfront, venue in or around the City. No doubt, he may prefer a waterfront venue, but the Municipal Fish Wharf is by no means the only waterfront venue for seafood sales in the Washington, D.C. area. Simply stated, he would have to lease or buy a new retail location. This hardly amounts to irreparable harm.

*Id.* at 14. Indeed, the plaintiffs' motion begs the question: why couldn't they relocate their seafood store to another area?

While the court is aware of the well-known phrase that the three most important things in real estate are "location, location, location," the plaintiffs have failed to demonstrate that their business could not survive, or even thrive, somewhere else in the District. In fact, the plaintiffs do not even address this point in either their motion or in their two reply briefs. In the worst-case scenario, the plaintiffs might face a transition or modification of their business. This, however, does not amount to a *destruction* of their business. In fact, even assuming the plaintiffs had to move their store to another, less profitable venue, this move would constitute merely an economic loss for the plaintiffs. And by the plaintiffs' own admission, economic loss alone does not rise to the level required to show irreparable harm.

Moreover, "[a] preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Fiba Leasing Co., Inc. v. Airdyne Indus., Inc.*, 826 F.Supp. 38, 39 (D.Mass.1993); *see also San Francisco Real Estate Investors v. Real Estate Investment Trust*, 692 F.2d 814, 818 (1st Cir.1982). Although the defendants omit this argument, the court raises it on its own because the plaintiffs· in this case seem to have suffered the most from their own actions or inactions. As noted above, the plaintiffs, who were month-to-month tenants throughout the negotiation process—or their prior counsel appear to have

made a gross miscalculation by not accepting the District's good-faith offer to sign a contract for a 30–year lease.

In sum, the plaintiffs do not make a strong showing on the irreparable-harm prong.

### 3. Harm to the Defendants from a Preliminary Injunction

While this factor does not cut strongly in either direction, the court determines that it leans toward the defendants. If the court were to grant the plaintiffs' motion for a preliminary injunction, the District defendants contend they would be harmed in two ways: (1) they would be unable to implement the improvements Congress intended to occur via its $3–million renovation plan; and (2) the District's long-term leases with the other Wharf lessees would be "in limbo, indefinitely," depriving the District of the rents negotiated in the new leases. *See* District Defs.' Opp'n at 16. The court rules that these are valid arguments.

### 4. Public interest

The plaintiffs' anemic theory on this prong essentially amounts to an argument that the public interest "will best be served by competition, and not the monopoly which will result from the unlawful grant of the government contracts for the Wharf." Mot. for P.I. at 30. As noted above, the court finds no reason to believe that the District granted these contracts unlawfully, and sees no evidence of a monopoly here. On the public-interest prong, the defendants make a significantly stronger case. First, the District defendants contend persuasively that the public interest would be best served by permitting the $3–million renovation plan anticipated by Congress to take effect, thus resulting in marked improvements to the Wharf. *See* District Defs.' Opp'n at 17. Furthermore, the Wharf defendants point out that the District would miss out on additional rental income if slots 16, 17, 18, and 19 remain empty. *See* Wharf

Defs.' Opp'n at 25. In addition, "under the terms of the leases, the Wharf Defendants are to pay significantly more in rental income for their current premises than they have previously." *See id.* The plaintiffs do not dispute any of these points. Finally, the Wharf defendants argue that the public would benefit from having a greater selection of seafood from businesses that would be operating from slots 16, 17, 18, and 19. The court agrees, and concludes that the public-interest prong tilts heavily toward the defendants.

In sum, because the plaintiffs have at best only a questionable likelihood of success on the merits, and because the other three prongs of the injunctive-relief test come down in the defendants' favor, the court will deny the plaintiffs' motion for a preliminary injunction.

## IV. CONCLUSION

For all of these reasons, the court denies the plaintiffs' motion for a preliminary injunction. An order directing the parties in a fashion consistent with this Memorandum Opinion is separately and contemporaneously issued this 28 day of February, 2001.