AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, Plaintiff,

v.

Elaine L. CHAO, Secretary of Labor, Defendant.

No. CIV.A. 03–2464(GK).

United States District Court, District of Columbia.

Dec. 31, 2003.

Robert M. Weinberg, Leon Dayan, Bredhoff & Kaiser, P.L.L.C., Washington, DC, for Plaintiff.

Jacqueline E. Coleman, U.S. Department of Justice, Washington, DC, for Defendant.

## *MEMORANDUM OPINION*

KESSLER, District Judge.

Plaintiff, the American Federation of Labor and Congress of Industrial Organizations ("Plaintiff" or "AFL–CIO")[1], brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, for judicial review of the Final Rule entitled "Labor Organization Annual Financial Reports" ("Rule" or "Final Rule") issued by Defendant Elaine L. Chao, Secretary of Labor ("Secretary"), on October 9, 2003, 68 Fed.Reg. 58374. The Rule did not become binding until November 10, 2003, when it received final approval from the Office of Management and Budget pur- suant to the Paperwork Reduction Act, 44 U.S.C. § 3501, *et seq.*. Plaintiff filed suit on November 26, 2003, alleging that the Secretary's action in issuing the Rule was "arbitrary and capricious." 5 U.S.C. § 706(2)(a).

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction.[2] Upon consideration of the Motion, Opposition, Reply, the *amicus curiae* brief of the National Right to Work Legal Defense Foundation,[3] the oral arguments presented December 30, 2003, and the entire record herein, and for the reasons stated below, Plaintiff's Motion for Preliminary Injunction is granted.

In summary, the Court concludes that Plaintiff will suffer irreparable harm if forced to start complying with the requirements of the new reporting Rule by January 1, 2004. The Department of Labor has allowed the unions covered by the statute less than two months to make the extensive and sophisticated accounting, computer, and employee training changes that are necessary in order to bring them into compliance with the Rule. A one-year postponement of the effective date of the new Rule will cause no harm to either the Department of Labor or to union members.[4] Given the fact that the present regulations, which the Department of Labor has maintained in effect for more than 40 years, will continue in effect, there will

---

1. The AFL–CIO is a federation of 65 national and international labor organizations with a total membership of approximately thirteen million workers. Plaintiff brings this action on its own behalf and on behalf of its member unions and their affiliated local unions. Compl. ¶ 5.

2. With the agreement of counsel, the Court has consolidated Plaintiff's Motion for Preliminary Injunction with the merits of the case, pursuant to Fed.R.Civ.P. 65(a)(2).

3. The National Right to Work Legal Defense Foundation is a non-profit, charitable organi- zation which provides free legal assistance to individual employees who allege that, as a consequence of what they deem to be compulsory unionism, they have suffered violations of their right to work and other fundamental liberties and rights guaranteed by the Constitution and federal and state law.

4. While the Court discussed a shorter time frame with counsel, the parties agreed that a one-year postponement was appropriate, if any delay was to be ordered.

be no discernable harm to the public interest. The Court will soon be issuing a final dispositive Opinion on the broader issues presented in Plaintiff's request for permanent injunctive and declaratory relief. It must be emphasized that those broader issues are not being decided at this time. Much of the background information presented herein will also be relevant to that final decision on the merits.

## I. BACKGROUND

### A. History of the Reporting Requirements

In 1959 Congress enacted the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 401 *et seq.*, ("LMRDA"), requiring unions, among other things, to file annual reports with the Secretary of Labor disclosing detailed information about their financial transactions. Congress imposed this financial reporting requirement to protect the rights of union members, to guard against corruption, and to prevent "other failures to observe high standards of responsibility and ethical conduct" in the course of labor-management activities. *See* 29 U.S.C. § 401(a)-(c).

Specifically, Section 201(b) of the LMRDA requires unions covered by the statute to file annually with the Secretary a financial report which accurately discloses their financial condition and operations for the preceding fiscal year. *See* 29 U.S.C. § 431(b). Under that provision, James Mitchell, Secretary of Labor under President Dwight D. Eisenhower, promulgated the first regulations implementing the LMRDA on January 20, 1960. *See* 25 Fed.Reg. 433 (1960); 29 C.F.R. § 403. Those regulations, with only minor modifications, have been in place for forty-three years.

The first implementing regulations required unions with $20,000 or more in annual receipts to submit their financial report on a "Form LM-2." Smaller unions were required to submit theirs on a simpler "Form LM-3." In 1962, the Department of Labor ("Department") raised the filing threshold for the Form LM-2 to $30,000; in 1981, it raised it to $100,000; and in 1994, it raised it again to $200,000. *See* 67 Fed.Reg. 79280, 79293 (Dec. 27, 2002). Under the $200,000 filing threshold, 79 percent of all covered unions were eligible to file the simpler Form LM-3, and only 21 percent were required to file the Form LM-2.

### B. The Rulemaking Process

### 1. The Notice of Proposed Rulemaking

On December 27, 2002, the Department issued a Notice of Proposed Rulemaking ("NPRM"), initiating the formal process that resulted in the Final Rule now in issue. *See* 67 Fed.Reg. 79280-414 (Dec. 27, 2002).

The NPRM described the increasing trend away from small, independent unions and toward larger unions that tend to resemble modern corporations in their structure and complexity. The NPRM noted that these large unions often

> manage full-featured benefit plans for their members, maintain close business relationships with financial service providers such as insurance companies and investment firms, offer multiple compensation opportunities to their senior executives and officials, operate revenue-producing subsidiaries, conduct extensive government lobbying, and participate in foundations and charitable activities.

67 Fed.Reg. at 79280.

The Department determined that, despite these operational and structural changes in the nature of unions, the forms on which the unions reported financial

transactions remained essentially unchanged and were a barrier to full and transparent reporting. *See* 67 Fed.Reg. at 79280. The Department noted that the forms allowed the reporting of "large expenditures for generalized purposes" without providing any detail. 67 Fed.Reg. at 79281. "Recent [F]orm LM–2 reports filed with the Department disclosed, for example, expenditures of $7,805,827 for 'Civic Organizations,' and $3,927,968 for 'Sundry Expenses,' and $7,863,527 for 'Political Education.'" 67 Fed.Reg. at 79281.

The Department observed that "the current [Form LM–2] does not require the union to disclose the identity of the recipient of the funds, making it difficult to determine whether these amounts were actually spent for the described activities," and difficult for union members to know "whether or not their dues were spent appropriately." 67 Fed.Reg. at 79282. The Department also noted that Office of Labor Management Standards' ("OLMS") investigations of fraud and embezzlement revealed that the "broad aggregated categories on the existing forms made it possible to hide embezzlements, self-dealing, overspending and financial mismanagement." 67 Fed.Reg. at 79282.

The Department also found that similar problems surrounded "trust[s] in which a labor organization is interested," as defined in § 3(l) of the LMRDA, 67 Fed. Reg. at 79282. Specifically, the Department noted that unions have substantial dealings with their affiliated entities, and that if a union transfers funds to such an entity, "union members may have no way to determine whether the funds in question were actually spent for the benefit of members." 67 Fed.Reg. at 79282. The Department pointed out, for example, that "joint training funds have been used to pay union officials supplementary salaries or host extravagant parties for trustees." 67 Fed.Reg. at 79283.

The proposed rule mandated, *inter alia,* (1) that receipts, disbursements, and accounts payable and receivable in excess of a threshold amount be individually reported on the Form LM–2; (2) that all such expenditures be reported in new "functional" categories;[5] (3) that unions estimate and report on the Form LM–2 the time each officer and member spends on activities corresponding to the functional categories; (4) that unions report the number of members in specific categories; (5) that unions report the assets, liabilities, receipts, and disbursements of all "significant trusts" in which they have an interest on the Form T–1; (6) that unions file the Form LM–2 electronically.

At the outset of the rulemaking process, the Secretary acknowledged that additional burdens would be imposed by the new reporting requirements. In weighing the burden that the changes would entail, she noted that she would rely primarily on data provided by affected parties. "Information regarding the burden imposed by making the proposed changes and the benefit to be gained is most likely to be obtained by proposing the changes for comment so that unions who file these reports, union members, and other groups that represent workers can express their views." *See* 67 Fed.Reg. at 79282.

### 2. Comments on the Proposed Rule

During the ninety-day comment period, the Department received over 35,000 comments. Although a majority of these comments were form letters, approximately 1,200 individualized comments, including a lengthy, substantive, and detailed

---

5. A "functional" category is one that reflects the program or activity the expenditure ultimately supports, i.e., organizing, contract negotiation, lobbying, etc.

empirical analysis from the AFL–CIO, were received from union members, unions, employers and trade organizations, public interest groups, accountants and accounting firms, academics, and members of Congress. A majority of the comments the Department received opposed the proposed reporting requirements, asserting that compliance would be overly burdensome. *See* Def.'s Opp'n at 6.

The AFL–CIO's study of the burdens of the proposed rule was prepared by economist Ruth Ruttenberg ("Ruttenberg Report"). *See* Pl.'s Ex. 3, Tab A. The Ruttenberg Report concluded that the Secretary's initial $14.7 million estimate of the economic burden that the proposed rule would place on reporting unions was too low. *See id.* at 4. It estimated, using median-per-union cost figures, that the total costs of implementing the new form LM–2 electronic filing system for AFL–CIO affiliates would be approximately $712 million. This figure did not include either the compliance costs attributable to the Form LM–2 filers which are not AFL–CIO affiliates, or the costs of completing other proposed reporting forms, such as the Form T–1 for "significant trusts." *Id.* at 31.

The AFL–CIO's study also addressed the issue of the lead time needed for compliance, concluding that, depending on the size and resources of the union, unions would require between six months and one year before the beginning of the first reporting period to which the Rule would apply to adjust their accounting and information technology systems in order to accurately collect and record the mandated new information. *See id.* at 18.

## C. The Requirements of the Final Rule

On October 9, 2003, approximately nine months after publishing the NPRM, the Secretary promulgated her final rule implementing the new Form LM–2, *see* 68 Fed.Reg. 58374 (Oct. 9, 2003), which, as already noted, did not become binding until November 10, 2003, when it was approved by the Office of Management and Budget ("OMB").[6] The Final Rule provides that it will become effective January 1, 2004, some seven weeks after OMB's approval.

In promulgating the Final Rule, the Secretary used a cost-benefit analysis to determine the appropriateness of the Rule. *See* 68 Fed.Reg. at 58409 ("the real question is whether an increase in cost, once it is accurately measured, is justified by the increased benefits to union members"). However, in response to concerns expressed by cementers, the Department modified numerous provisions including, *inter alia*, (1) raising the Form LM–2 filing threshold from $200,000 to $250,000 in total annual receipts,[7] *see* 68 Fed.Reg. at 58383, 58429; and (2) setting the dollar threshold for "major" receipts and disbursements at $5,000, *see* 68 Fed.Reg. at 58388–90.

The Final Rule will apply prospectively to financial reports filed by unions with fiscal years beginning on or after January 1, 2004. *See* 68 Fed.Reg. at 58374. There

---

6. The Paperwork Reduction Act dictates that final agency rules which require "information collection" are subject to review by the OMB. The OMB must approve or disapprove an information collection between 30 and 60 days after the publication of the Rule. *See* 5 C.F.R. § 1320.11(h). A proposed information collection is not enforceable until OMB has approved the rule or 60 days have passed without disapproval. *See* 5 C.F.R. § 1320.6.

7. As a result of this modification, the Department anticipates that 501 fewer unions will have to file the Form LM–2. 68 Fed.Reg. at 58421.

are 4,778 labor organizations that will be required to file a Form LM–2 under the new Rule, and two-thirds of them (3,185 or 19% of all labor organizations covered under the LMRDA), have fiscal years that begin on January 1, 2004. *See* 68 Fed. Reg. at 584121; Decl. of Linda Jardine ¶ 8. The first report containing the information required under the Rule for fiscal year 2004–2005 will be due on March 31, 2005. *See* 68 Fed.Reg. 58410–12. Unions that have fiscal years that begin on a date other than January 1 (such as April 1 or July 1) will have a concomitant amount of additional time to comply with the Rule.[8] *See* 68 Fed.Reg. at 58412.

A union covered by the statute must file its Form T–1, or qualifying audit in lieu of the Form T–1, simultaneously with the union's filing of its Form LM–2. *See* 68 Fed.Reg. at 58418. The Form T–1, however, covers the trust's, not the union's, fiscal year. At the time a union files its Form LM–2, the covered union must provide a Form T–1 for the trust's most recent fiscal year that ended during the union's reporting year. *See* 68 Fed.Reg. at 58418.

### 1. The Form LM–2

The Rule requires unions with total annual receipts greater than $250,000 to provide an itemized accounting of all receipts, disbursements, and accounts payable and receivable in excess of $5,000 on a Form LM–2 if the receipt, disbursement, or account payable or receivable falls into one of five designated "functional" categories.[9] Labor organizations with annual receipts under $249,000 are required to submit a Form LM–3. Unions with annual receipts under $10,000 are required to submit a Form LM–4. Both Forms LM–3 and LM–4 require far less information than Form LM–2.

Unions must file the Form LM–2 electronically. The Department is developing software that will enable each union to file its financial data electronically. This software, which has not yet been made available to the covered unions, will be offered without charge. *See* 68 Fed.Reg. at 58411.

### 2. The Form T–1

The Final Rule requires a union to file a Form T–1 if (1) it has an interest in a trust, as defined in the LMRDA § 3(1), 29 U.S.C. § 402(1);[10] (2) the union and the trust each have annual receipts of $250,000 or more; *and* (3) the union makes a financial contribution to the trust, or a contribution is made on the union's behalf, of $10,000 or more. If a union's financial contribution to a trust, or a contribution made on the union's behalf, is less than $10,000 or the union has an interest in a trust that has annual receipts of less than $250,000, the union only has to report the existence of the trust and the amount of

---

8. The AFL–CIO, whose fiscal year begins on July 1, will not have to file a report that complies with the Rule until September 28, 2005.

9. The five functional categories are (1) Representational Activities (Schedule 15); (2) Political Activities and Lobbying (Schedules 16 and 17); (3) Contributions, Gifts and Grants (Schedule 17); (4) Union Administration and General Overhead (Schedules 18 and 19); and (5) Benefits (Schedule 20).

10. A "trust in which a union is interested" is defined in LMRDA § 3(1) as a "trust or other fund or organization (1) which was created or established by a labor organization, or one or more of the trustees or one or more members of the governing body of which is selected or appointed by a labor organization, and (2) a primary purpose of which is to provide benefits for the members of such labor organization or their beneficiaries." 29 U.S.C. § 402(1).

the union's contribution or the contribution made on the union's behalf.

### D. The Instant Challenge to the Rule

On November 26, 2003, the AFL–CIO filed the instant action seeking a Preliminary Injunction postponing the effective date of the Rule, as well as permanent relief setting aside the Rule and enjoining its implementation.

The AFL–CIO maintains that it is entitled to relief on two grounds. First, it claims that the Secretary lacks the statutory authority under §§ 201(b) and 208 of the LMRDA to issue the Rule, and that she is not authorized "to require labor organizations to report every receipt and disbursement, in any amount." 68 Fed. Reg. at 58376.

Second, Plaintiff claims that the Secretary's action in issuing the Rule is arbitrary and capricious because (1) she gave unions covered by the statute less than two months to make the significant changes to their computer hardware, software programs, accounting systems, and employee training programs necessary to comply with the January 1, 2004 effective date; (2) she underestimated the increased costs of compliance associated with the Rule and (3) she failed to adequately explain her cost estimates.

## II. PLAINTIFF IS ENTITLED TO IS-SUANCE OF A PRELIMINARY INJUNCTION

### A. Legal Standard for Preliminary Injunctive Relief

The case law in this Circuit is well established that when considering a plaintiff's request for a preliminary injunction, the court must examine whether (1) there is a substantial likelihood of success on the merits, (2) Plaintiff will be irreparably injured if the requested injunction is denied,

(3) an injunction will substantially injure the opposing party and (4) the public interest will be furthered by issuance of the injunction. *Davenport v. International Brotherhood of Teamsters, AFL–CIO,* 166 F.3d 356, 360 (D.C.Cir.1999); *Serono Labs. v. Shalala,* 158 F.3d 1313, 1317–18 (D.C.Cir.1998); *Washington Metropolitan Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977). As Judge Garland noted in *Davenport,* "[t]hese factors interrelate on a sliding scale and must be balanced against each other." 166 F.3d at 360–61. Moreover, a particularly strong showing on one factor may compensate for a weaker showing on one or more of the other factors. *Serono,* 158 F.3d at 1318. "The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors." *New Mexico v. Richardson,* 39 F.Supp.2d 48, 50 (D.D.C.1999).

In addition, it is essential to recognize that preliminary injunctions are extraordinary forms of judicial relief and therefore must be granted sparingly. As the Supreme Court has recently noted "[i]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).

Keeping all of these principles in mind, the Court concludes for the following reasons that Plaintiff, AFL–CIO, has clearly demonstrated that the particular provision of the Rule establishing its effective date as of January 1, 2004 will cause enormous irreparable harm to those affected. Moreover, there is a substantial likelihood of Plaintiff succeeding on the merits of its argument that imposition of the January 1, 2004 effective date, with less than two months' notice to all concerned, is arbi-

trary, capricious and in violation of the APA. Finally, neither the Secretary of Labor nor the public interest will be injured by a one year delay in implementation of the Rule, especially in light of the fact that the existing reporting requirements which have been in effect, largely unchanged, for more than 40 years, will remain in effect.[11]

### B. Irreparable Injury

■ As noted earlier, despite the fact that the Rule did not become binding until November 10, 2003, it becomes effective January 1, 2004. As a practical matter, what this means is that as of January 1, 2004, with less than two months' notice, all of the covered unions will have to change the reporting mechanisms and protocols which have complied with federal regulations for more than forty years, so as to meet the detailed requirements of the new Rule. In order to do this, the unions will have to take numerous irreversible steps.

The Secretary's own cost assessment for meeting the demands of the Final Rule (a cost assessment which Plaintiff maintains is far too low) is $80 million for the first year of implementation. Moreover, the vast bulk of the costs for start-up planning, purchasing and staff training associated with the Final Rule must be borne during the initial phase of compliance. These initial compliance steps must be taken as early as possible because, if a union does not have the benefit of professional advice from experienced accountants, lawyers and information technology experts, if it does not have its new accounting system in place, if it does not have its employees trained, and if it does not have its new computers purchased and its new software

installed before the beginning of its fiscal year, it will face an untenable situation in which it will lose ground every day because the new systems are not in place.

The AFL–CIO submitted a lengthy declaration from an experienced Certified Public Accountant, who has for more than 30 years performed accounting and auditing services for non-profit organizations, more than half of which have been unions and employee benefit plans. See Jardine Decl., ¶¶ 1, 2. She, of course, performs her work in accordance with Generally Accepted Auditing Standards. Jardine Decl., ¶ 3. In her affidavit, she concluded that:

> 1) unions do not currently record all of the key data required under the new rule because such data do not serve the traditional purposes of a union accounting system; 2) unions will have to make major changes to their accounting systems in order to record and report such data; 3) each union must make these changes before its fiscal year begins in order to track and report the required data accurately; 4) these changes will be costly and time-consuming; 5) failure to begin the fiscal year with the necessary changes in place will cause unions to spend considerably more time and money trying to comply with the requirements of the new rule than if they began the fiscal year with the necessary changes; 6) such failure will jeopardize the accuracy of the financial data unions must record and report under the new rule.

Jardine Decl., ¶ 9.[12]

She further concluded that "most unions will have to extensively or significantly

---

**11.** The year long delay in implementation of the Rule may turn out to be moot if the Court concludes that the Rule, on its merits, cannot withstand scrutiny under the arbitrary and capricious standard of the APA. However,

that is not the Court's ruling as of this moment.

**12.** In subsequent paragraphs, Jardine provides lengthy, detailed, factual support and

revise their accounting systems." Jardine Decl., ¶ 35. As she explained, "[r]evisions to an accounting system of the sort described in the preceding paragraph require special training and supervision of all personnel with responsibility for processing expenditures ... including those in other departments [than accounting] who are responsible for procuring services and approving invoices or other requests for payment." Jardine Decl., ¶ 36.

As noted earlier, the Final Rule requires, for the first time, the use of a new functional category approach. According to the Jardine Declaration, ¶ 44, adding a new functional category approach into a union's existing accounting system is a difficult and time-consuming process.[13] Based on her experience as a CPA, Jardine concluded that:

> *any* organization, whether or not it is a union, that decides to make modifications to its existing accounting system or replace its accounting system altogether, needs to spend considerable time researching and comparing the available options with respect to suitability and cost. Many of my clients who have undertaken such purchases have been able to do so only by consulting with outside experts in information technology and accounting. Moreover, migrating to an entirely new system requires months of preparation in order to ensure that the system functions properly and there is no loss of historical data. This implementation usually involves a substantial number of parallel test runs before the organization converts officially to the new or modified system. Similarly, making the transition to a modified system may take a substantial amount of

time and preparation to ensure the proper functioning of the system.

Jardine Decl., ¶ 47 (emphasis in original).

The Jardine Declaration also pointed out, at ¶¶ 50–54, that until the transition system a union adopts in order to comply with the Final Rule is completed, that system will be burdened with a continually expanding backlog of improperly processed data. Once that system is completed, then the improperly processed data will have to be individually corrected and recoded, provided that the software package chosen by the union allows users to modify or recode previously entered data.

Finally, despite the fact that the Final Rule becomes effective on January 1, 2004, and despite the fact that it is essential that the unions change their accounting and computer systems as early as possible, the Department has not yet distributed the reporting software that it has promised in order to implement the mandated electronic filing provisions of the new Rule. At oral argument, the Government indicated that it expected to have such software ready for distribution within the first quarter of the fiscal year. However, as the Jardine Declaration points out in ¶ 61, if a union discovers several months *after* the beginning of its fiscal year that it has not designed its query and report system correctly in light of the reporting software distributed by the Department, that union may be faced with having to redesign and re-execute all of its queries and reports or having to manually "cut and paste" information from its internal accounting reports into the LM–2 form at the end of the fiscal year. In either event, the options are

---

explanations for her conclusions. See ¶¶ 10–34.

**13.** For example, at a minimum, the unions "will have to develop concrete definitions of each functional category to ensure that expenditures are coded consistently." Jardine Decl., ¶ 36.

"expensive, resource-intensive, and time-consuming." *Id.*

As the foregoing demonstrates, the AFL–CIO and its associated unions will indeed suffer irreparable harm if there is a subsequent ruling on the merits which invalidates the Final Rule. Nothing can be done to restore the unions to their previous position. This result is exacerbated by the fact that it is essential for the unions to undertake the great majority of the steps necessary to change their accounting systems in the very early stages of the fiscal year, during the exact period when the Court may be deliberating about the merits of the controversy.[14] Finally, if the Court were to deny preliminary injunctive relief and later invalidate the Final Rule, the unions would then have to expend additional unrecoverable money, resources and staff time in transitioning back to comply with the previously existing LM–2 regulations.

### C. Likelihood of Success on the Merits

Under the APA, an agency's action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The arbitrary and capricious standard [of the APA] is a narrow standard of review." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ In order for an agency to survive arbitrary and capricious review under the APA, the agency must adequately explain its result. *Public Citizen, Inc. v. FAA,* 988 F.2d 186, 187 (D.C.Cir.1993); *Fed. Election Comm'n v. Rose,* 806 F.2d 1081, 1088 (D.C.Cir.1986). *See also Pension Ben. Guar. Corp. v. LTV Corp.,* 496 U.S.

633, 654, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (an agency must "provide an explanation that will enable the court to evaluate the agency's rationale at the time of the decision"); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (an agency's explanation must minimally contain "a rational connection between the facts found and the choice made") (citing *Burlington Truck Lines, Inc. v. U.S.,* 371 U.S. 156, 158, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

■ In this case, the Department has given the covered unions less than two months to make the enormous changes necessary to their accounting, computer, software and staff training to comply with the new Rule. The Secretary acknowledges that "some interim period will be needed for unions to adapt their recordkeeping systems to the new requirements," 68 Fed. Reg. at 58411, and that "filers will need to study and understand the new requirements, make adjustments to the union's recordkeeping system, and train staff." *Id.* However, she offers no record support which would justify selection of a brief two month transition period to bring covered unions into compliance with the new Rule. In order to do all of the tasks necessary to bring a union's systems into compliance with the new Rule, it is clear that a period of seven weeks (seven weeks which included the Thanksgiving and Christmas holidays) was inadequate.

Significantly, the Secretary offers no rebuttal or counter-declaration to that filed by Jardine. Nor did the Government at oral argument offer any substantive explanation as to how the covered unions would be able to meet their obligations under the Final Rule in the brief period of time

---

**14.** It should be remembered that Plaintiff is challenging the Secretary's statutory authority to issue the Rule, as well as its reasonableness.

allotted. The lengthy Jardine Declaration rested on a firm factual basis, was extremely detailed, and well reasoned. Nothing in the record contradicted the very practical considerations presented in that affidavit. Interestingly, back in 1992, when the Secretary adopted a financial reporting rule with some changes similar to those contained in the present Final Rule, she ultimately postponed its effective date for a year after concluding that the initially proposed two months' transition time was not sufficient for the unions to modify their accounting systems.

This regulation has been under consideration for just under a year. Given that fairly lengthy period of time, the fact that existing regulations are now and will remain in effect, and the extensive systems modifications described as necessary in the Jardine Declaration, the Court concludes there is a substantial likelihood that Plaintiff will prevail in its argument that a two month transition period is arbitrary, capricious and in violation of the APA. The Secretary has simply failed to offer any reasonable justification for requiring such far-reaching changes to take place in a period of seven weeks, especially when that seven week period encompasses two of the major holiday periods of the year.

### D. Injury to the Secretary and the Public Interest

 There is no evidence whatsoever that a temporary stay of the implementation of the Final Rule will cause any significant harm to the Secretary, to union members, or to the public. It is noteworthy that the Secretary, in choosing the January 1, 2004 effective date, did not claim any particular need for extraordinary urgency. While it may well be that there is justification for the Final Rule adopted by the Secretary, there is certainly good reason to preserve the status quo

as it existed before the effective date of the new regulation, especially when that status quo has been deemed acceptable by the Department of Labor for over 40 years.

For all the foregoing reasons, the Court concludes that the Motion for a Preliminary Injunction should be **granted**.